UNITED STATES of America, Plaintiff,

v.

Dennis KAUN, Defendant.

No. 84–C–0569.

United States District Court,
E.D. Wisconsin.

April 9, 1986.

Diane E. Tebelius, Tad Div., U.S. Dept. of Justice, Washington, D.C., and Stephen J. Liccione, Asst. U.S. Atty., Milwaukee, Wis., for U.S.

Dennis Kaun, pro se.

## MEMORANDUM AND ORDER

WARREN, District Judge.

Presently before the Court in this matter is the petition of the plaintiff, United States of America, for certain permanent injunctive relief against the defendant, Dennis Kaun, pursuant to Rule 65 of the Federal Rules of Civil Procedure. For the reasons articulated at length herein, the Court shall grant the plaintiff's motion and award judgment in favor of the United States of America, pursuant to Sections 7402(a) and 7408 of Title 26 of the United States Code and the specific terms and conditions prescribed below.

## PROCEDURAL BACKGROUND

This civil action was initiated on May 2, 1984, when the plaintiff, United States of America, filed its complaint for injunctive relief, pursuant to 26 U.S.C. §§ 7402(a) and 7408. By this action, the plaintiff seeks to enjoin the defendant, Dennis Kaun, from promoting allegedly false or fraudulent plans or schemes to avoid the payment of federal taxes and from otherwise interfering with and impeding the proper administration and enforcement of the Internal Revenue laws.

Along with its complaint, the United States filed and served a motion for preliminary and permanent injunctive relief, for an expedited hearing on the issues raised by this lawsuit, and for consolidation of the hearing with the trial on the merits, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. Submitted in support of the plaintiff's several motions were a memoranda of law on these matters critical to the petition for injunctive relief and a declaration of one of the plaintiff's attorneys, by which he verifies, among other things, the authenticity of certain documents upon which the United States bases its case in large part.

On May 4, 1984, in what was to be but the first of its several rulings in this colorful litigation, the Court scheduled a two-day hearing on the plaintiff's petition for injunctive relief for June 20–21, 1984, and ordered that the formal trial on the merits of this matter be consolidated with the hearing, effectively granting the United States' request for this procedural arrangement. By its terms, the Court's order also directed the defendant to appear at the scheduled hearing date to show cause why the relief demanded in the complaint and the related motion for injunctive relief should not be granted.

On May 22, 1984, the defendant filed and served a motion to dismiss the action for lack of subject matter jurisdiction and, on June 5, 1984, submitted two memoranda of law which the Court construed as briefs in support of this jurisdictional petition. By his letter of June 15, 1984, to the Court, plaintiff's counsel advised that, while the United States would not file a formal response to the defendant's jurisdictional challenge, it would be prepared to argue its merits at the time of the scheduled hearing.

On June 7, 1984, the defendant filed a second motion in this matter—this one, to set aside the Court's order of May 4, 1984, consolidating the trial on the merits with the hearing on the petition for preliminary injunctive relief. Eleven days later, on June 18, 1984, the plaintiff submitted a substantive brief in opposition to the vacation motion.

The defendant's third pretrial motion, also filed and served on June 7, 1984, sought to compel the United States to answer certain interrogatories. Thereafter, in the wake of the plaintiff's provision of certain interrogatory answers, the Court denied the defendant's discovery motion as moot.

On June 13, 1984, the plaintiff filed an amended complaint in this matter, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, clarifying and rendering more explicit the substantive allegations of the original pleading. Five days later, on June 18, 1984, the defendant interposed a motion for a continuance of ninety (90) days in the scheduled hearing date, purportedly to permit him to retain counsel to represent him throughout further proceedings in the action. Finally, on June 19, 1984, one day before the hearing on the plaintiff's petition for injunctive relief, the defendant submitted an answer to the amended complaint, denying all material allegations therein, raising several affirmative defenses, and requesting that the lawsuit be dismissed in its entirety and on its merits.

As scheduled, the consolidated hearing and trial on the merits of the case began on June 20, 1984, with arguments on the defendant's three, outstanding motions—namely, to dismiss for lack of jurisdiction, to set aside the Court's consolidation ruling, and to continue the matter for a period of ninety (90) days. Following presentations by the respective parties on these three matters, the Court, for the reasons

articulated at length on the record, denied all of the defendant's threshold challenges to these proceedings. Thereafter, the Court heard testimony from some eight government witnesses, including several special agents of the Criminal Investigation Division of the Internal Revenue Service, and from some four defense witnesses, including the defendant himself.

At the conclusion of the two-day trial on June 21, 1984, the Court entertained argument from the respective parties on the merits of the action and, thereafter, advised that it would take the matter under advisement and issue a dispositive written order following its considered deliberation. In the wake of the hearing, the parties submitted their respective proposed findings of fact and conclusions of law. With today's order, the Court reviews the testimony and documentary evidence adduced during the hearing and issues its final ruling disposing of this action in its entirety.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

As suggested by the Court's description of the procedural history of this case, the two-day hearing and trial on the merits of the action proved both colorful and occasionally vociferous. Frequently, the testimony elicited from the plaintiff's and the defendant's witnesses revealed more about the profoundly troubling nature of the defendant's activities than either party may have known. One such exchange between the defendant on cross examination and Ms. Lynn Griffin, Special Agent with the Criminal Investigation Division of the Internal Revenue Service, occurred several hours into the second day of trial; the subject was the payment of membership fees or donations by those attending the defendant's seminars:

QUESTION (BY MR. KAUN): You paid dollars or did you pay Federal Reserve Notes?

ANSWER (BY MS. GRIFFIN): What I consider dollars. Federal Reserve Notes, it says—on the bill it says "Federal Reserve Note." So its—

QUESTION: If I wrote on this cup that this is an airplane, would that be an airplane?

ANSWER: No.

*Transcript of Proceedings* at 288 (June 21, 1984, Vol. 2).

To be sure, the recorded exchange is, at one level, an example of the silly, often irrelevant discussion that unfortunately consumed much of the hearing; at another level, it is a perfect revelation—coming from the defendant himself—of the fundamental error in his assumed mission in life. For just as a cup does not become an airplane simply by labeling it as such, so, too, the Internal Revenue laws and the numerous guidelines and regulations promulgated under them do not become what this defendant plainly believes and says they are—simply because he declares it so. It is wholly mistaken, completely unfounded, and sorrowfully misguided notions about the meaning and effect of the federal tax laws and about the role of the federal agency charged with their enforcement which, when propounded in both written and oral form to other citizens, potentially duped into believing and perhaps acting upon this defendant's gospel, that compels this Court to issue an injunction against the further dissemination of this unmistakable claptrap.

At the outset, the Court notes its clear jurisdiction to entertain a civil action of this sort and—most important—to issue the form of injunctive ruling articulated herein. Of course, it is axiomatic that the federal district courts possess all equity powers traditionally exercised by courts of equity. *See Porter v. Warner Holding Company,* 328 U.S. 395, 398, 66 S.Ct. 1086, 1089, 90 L.Ed. 1332 (1964) (encouraging the trial courts to "do equity and to mould each decree to the necessities of the particular case"). *United States v. U.S. Klans, Knights of Ku Klux Klan, Inc.,* 194 F.Supp. 897, 905 (N.D.Ala.1961) ("...[I]f the public interest is involved ... those equitable powers assume an even broader and more flexible character ..."). In this context, it has long been held that the

interests of the federal government in performing its constitutional and statutory duties may be protected by courts of equity; indeed, when individuals attempt to interfere with the government's ability to act, the federal courts have the power to enjoin those persons. 1 *Moore's Federal Practice* ¶ 0.65[1.–1], n. 2 at 700.82 (2d ed. 1983) (the United States "may sue for injunctive relief from interference with the accomplishment of its programs or otherwise to protect its interests"); *United States v. LeMay*, 322 F.2d 100, 103 (5th Cir.1963) (likewise).

Of course, with respect to actions initiated by the federal government involving the enforcement of Internal Revenue laws, Congress has both confirmed and codified the equity jurisdiction of the federal courts in Section 7402(a) of Title 26 of the United States Code. It reads as follows:

> The district courts of the United States at the instance of the United States shall have such jurisdiction to make and issue in civil actions, writs, and orders of injunction, and of *ne exeat republica*, orders appointing receivers, and such other orders and processes, and to render such judgments and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws. The remedies hereby provided are in addition to and not exclusive of any and all other remedies of the United States in such courts or otherwise to enforce such laws.

■ By its very terms, this statutory provision authorizes the federal district courts to fashion appropriate, remedial relief designed to ensure compliance with both the spirit and the letter of the Internal Revenue laws—all without enumerating the many, particular methods by which these laws may be violated or their intent thwarted. As stated by the Court of Appeals for the First Circuit, it "would be difficult to find language more clearly manifesting a congressional intention to provide the district courts with a full arsenal of powers to compel compliance with the Internal Revenue laws." *Brody v. United States*, 243 F.2d 378, 384 (1st Cir.1957),

*cert. denied,* 354 U.S. 923, 77 S.Ct. 1384, 1 L.Ed.2d 1438 (1957). The Court of Appeals for the Second Circuit has spoken just as clearly:

> The language of this statute [§ 7402(a)] is broad and clear. In addition to authorizing writs and orders ancillary to civil actions, it gives the district courts jurisdiction to issue "such other orders and processes, and to render such judgments and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws." We decline to construe such a broad statutory mandate so restrictively as to add nothing to the power conferred by the All Writs Act, 28 U.S.C. § 1651 (1970).

*United States v. First National City Bank,* 568 F.2d 853, 855–856 (2d Cir.1977).

■ Consistent with this broad, remedial purpose of § 7402(a), the federal courts have routinely relied on its grant of injunctive authority to preclude individuals, like the present defendant, from disseminating their rather perverse notions about compliance with the Internal Revenue laws or from promoting certain tax avoidance schemes. *See United States v. May*, 555 F.Supp. 1008, 1010 (E.D.Mich.1983) (enjoining defendant from distributing certain spurious tax forms based on the erroneous concept that wages, salaries, and other forms of income are not taxable), *United States v. Landsberger*, 692 F.2d 501, 503–504 (8th Cir.1982) (preventing defendant from promoting a fraudulent tax avoidance scheme entitled "Foreign Tax Haven Double Trust"). Based on the unequivocal language of the statute and the judicial gloss upon it, this Court concludes summarily that 26 U.S.C. § 7402(a) empowers it to act—and act decisively—on the pending petition for injunctive relief.

Moreover, the Court's jurisdiction in this litigation is further established by Sections 6700 and 7408 of Title 26 of the United States Code—provisions enacted by Congress as part of the Tax Equity and Fiscal Responsibility Act of 1982, commonly known as TEFRA. Intended principally to curb abusive tax shelter plans, § 7408 em-

powers the federal trial courts to enjoin conduct that is subject to penalty under § 6700. Section 7408 provides, in its entirety, as follows:

(a) **Authority to seek injunction.** A civil action in the name of the United States to enjoin any person from further engaging in conduct subject to penalty under section 6700 (relating to penalty for promoting abusive tax shelters, etc.) or section 6701 (relating to penalties for aiding and abetting understatement of tax liability) may be commenced at the request of the Secretary. Any action under this section shall be brought in the district court of the United States for the district in which such person resides, has his principal place of business, or has engaged in conduct subject to penalty under section 6700 or section 6701. The court may exercise its jurisdiction over such action (as provided in section 7402(a)) separate and apart from any other action brought by the United States against such person.

(b) **Adjudication and decree.** In any action under subsection (a), if the court finds—

(1) that the person has engaged in any conduct subject to penalty under section 6700 (relating to penalty for promoting abusive tax shelters, etc), and

(2) that injunctive relief is appropriate to prevent recurrence of such conduct,

the court may enjoin such person from engaging in such conduct or in any other activity subject to penalty under section 6700 or section 6701.

(c) **Citizens and residents outside the United States.** If any citizen or resident of the United States does not reside in, and does not have his principal place of business in, any United States judicial district, such citizen or resident shall be treated for purposes of this section as residing in the District of Columbia.

Section 6700(a), in turn, by its broad, remedial language, authorizes the imposition of penalties for promoting abusive tax shelters, as follows:

(a) **Imposition of penalty.** Any person who—

(1)(A) organizes (or assists in the organization of)—

(i) a partnership or other entity,

(ii) any investment plan or arrangement, or

(iii) any other plan or arrangement, or

(B) participates in the sale of any interest in an entity or plan or arrangement referred to in subparagraph (A), and

(2) makes or furnishes (in connection with such organization or sale)—

(A) a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter, or

(B) a gross valuation overstatement as to any material matter, shall pay a penalty equal to the greater of $1,000 or 20 percent of the gross income derived or to be derived by such person from such activity.

Significantly, 26 U.S.C. § 7701(a)(1) defines the term "person" to include, for tax purposes, individuals, partnerships, associations, companies, or corporations. Moreover, § 6661(b)(2)(C)(ii) describes the phrase "tax shelter" as "any ... plan or arrangement, if the principal purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax."

The powerful import of these several provisions is unmistakable:

Section 7408 authorizes the Internal Revenue Service to sue for an injunction on the grounds that the defendant has engaged in conduct subject to penalty under section 6700. 26 U.S.C. § 7408(a). If the district court finds that the defendant has engaged in such conduct and that injunctive relief is appropriate to prevent its recurrence, then the court may enjoin the defendant from engaging in it or in

any other activity subject to penalty under section 6700. . . .

Moreover, the Senate Finance Committee's Report on TEFRA confirms that Congress designed section 6700 as a "penalty provision specifically directed toward promoters of abusive tax shelters *and other abusive tax avoidance schemes.*" (emphasis original).

*United States v. Buttorff,* 761 F.2d 1056, 1063 (5th Cir.1985). In the end, the unequivocal congressional intention to curb both abusive tax avoidance schemes and the means of their dissemination—all as embodied in §§ 6700, 7402(a), and 7808 of the Internal Revenue Code—leads perforce to the recognition of this Court's jurisdiction over the present action and the concomitant rejection of the defendant's innovative, if stillborn, arguments for dismissal of the litigation in toto.

Indeed, the Court is impressed by the extent to which these statutory mandates, broadly drafted as they are, provide a neat, tight-fitting response to the sort of abusive activities undertaken by the named defendant under the ruse of "education." *See, e.g., Transcript of Proceedings* at 343, 346 (June 21, 1984, Vol. 2). Before reaching this conclusion, however, the Court feels obliged to describe in precise terms the exact nature of the defendant's actions that have, as their unmistakable purpose, the obstruction of and interference with the proper administration and enforcement of the Internal Revenue laws—a goal he promotes as the organizer and leader of the Wisconsin Society for Educated Citizens.

It is clear that that organization itself is managed informally: It has no elected officers, formal organization or structure, or controlling rules or bylaws. *Transcript of Proceedings* at 347 (June 21, 1984, Vol. 2). At the same time, the defendant is the unmistakable leader of the group; as he himself testified:

I surfaced as the leading person who obtained places to meet as well as places—obtaining people to come and talk to us and trying to keep a schedule going, trying to get this—the meeting that you heard of, the primary meeting earlier in testimony, I tried to have people present these things. We have—I try to keep things going, you might say I'm sort of like the manager of it, try to keep things going various ways.

*Transcript of Proceedings* at 346 (June 21, 1984, Vol. 2). Moreover, while members are explicitly precluded from inquiring about the group's financial resources or operating expenses, a monthly fee or so-called "contribution" of $25.00 is collected from each individual and $35.00 is collected from any married, working couple. *Transcript of Proceedings* at 274–275, 288 (June 21, 1984, Vol. 2).

Although the exact position of the Wisconsin Society for Educated Citizens as a branch of some nationwide movement is unclear, there is an unmistakable link between it and several, discrete organizations—most particularly the American or National Patriot's Association and the Minnesota Society for Educated Citizens. *Transcript of Proceedings* at 58–60, 116–117, & 150–151 (June 20, 1984, Vol. 1).

In addition, the Wisconsin association apparently exchanges information with the American Society for Educated Citizens, subscribes to and distributes certain national periodicals and newsletters memorializing and promoting its views on compliance with the Internal Revenue laws, and makes routine contributions to a national, legal defense fund. *Transcript of Proceedings* at 357–358 (June 21, 1984, Vol. 2).

Internally, the defendant has enlisted the aid of several co-members of the organization—including Alfred E. Feustel, Paul Larson, Christopher L. Niesel, Laslo Farkas, and George Meyers—in conducting meetings and recruiting members. *Transcript of Proceedings* at 110, 115, & 354–355 (June 20–21, 1984, Vols. 1 & 2). In the second of these undertakings, the defendant himself has promoted membership in the organization through the dissemination of handbills and written advertisements and his appearances on radio talk shows. *Transcript of Proceedings* at 314–315 (June 21, 1984, Vol. 2). He is also involved

in organizational efforts to establish similar groups throughout the state. *See, e.g., Transcript of Proceedings* at 356 (June 21, 1984, Vol. 2).

Weekly meetings of the Wisconsin Society for Educated Citizens, typically held at a suburban Milwaukee location, last approximately two-and-one-half hours and draw some sixty (60) to seventy-five (75) people in attendance. *Transcript of Proceedings* at 348–349 (June 21, 1984, Vol. 2). Proceedings begin with the pledge of allegiance and a so-called "legal notice," by which the defendant advises his audience that any "Government agent ... here to gather information for other than [his] own personal use ... [is] in violation of our rights, specifically the Constitution of the United States, Constitution of the State of Wisconsin and the Privacy Act of 1974...." *Transcript of Proceedings* at 96 (June 21, 1984, Vol. 1).

New members in the association are routinely required to attend, apparently as a part of their initiation to the group's fundamental beliefs, classes or taped presentations on constitutional law, frequently consuming as much as ninety (90) hours. *Transcript of Proceedings* at 217, 349 (June 21, 1984, Vol. 2). The general membership meetings, on the other hand, routinely included discussions on the import of the Internal Revenue laws and participation in the social security system, as recounted by Mr. Thomas Walkner, Special Agent for the Criminal Investigation Division of the Internal Revenue Service, who attended several of the association gatherings in the spring of 1984 in an undercover capacity:

> Well, the general membership meetings were probably, the highest percentages were about the Internal Revenue Service, and about taxes and so forth; specifically about taxes themselves, Mr. Feustel made certain comments about his position on being a taxpayer, and non-taxpayers, the fact that having some Social Security number makes you a taxpayer by your own admission, and that's why you should get rid of your Social

Security number, so you no longer are considered a taxpayer, the fact that the tax forms or 1040 is a contract, therefore, doesn't have to be filed, the fact that your 1040 forms are voluntary, and, therefore, you don't have to file a 1040.

> Mr. Feustel also talked about a W–4 situation, Mr. Feustel said that you don't really want to be exempt to W–4, you want to be immune to having to fill out a W–4 form, suggested this injunction against your employer, if necessary, or if you got to fill out a W–4, you should do it under, make a comment on there about filling out the W–4 under duress or under strain or something like this.

*Transcript of Proceedings* at 147–148 (June 21, 1984, Vol. 1). At one such general membership meeting of March 6, 1984, the defendant himself presented certain views on the invocation of the Freedom of Information Act and the Privacy Act, as described by Mr. Walkner as follows:

> During that meeting Mr. Kaun was primarily addressing the subject of the Freedom of Information Act and the Privacy Act. It was Mr. Kaun's feeling that each individual of the Wisconsin Society of Educated Citizens should send as many of the Freedom of Information Act requests into the IRS as possible. He suggested sending as many as one a day to the IRS to ask for things from your files or ask about information that the IRS may have in their files.... He told the membership that he wanted to do this to bog down the IRS....

> Mr. Kaun said that he expected that the more of these Freedom of Information Act requests that were sent in, the more it was going to bog down the IRS, bog down the Government in paperwork, and he gave an example, if say in Milwaukee the IRS District had five and a half million dollars as a budget, if they could wrap up a half-million dollars of this amount in time spent on searching for Freedom of Information Act material, Privacy Act material, there would be less time for the IRS to do their normal functioning, their examinations and so forth.

*Transcript of Proceedings* at 113, 114 (June 21, 1984, Vol. 1).

Yet the unmistakable purpose of these presentations is perhaps best revealed by the defendant himself, whose own words at the general membership meeting described above were recorded and transcribed as follows:

Alright. Now if they [government officials responding to FOIA requests] should ever write back and say to you they think the bill is gonna be high and they think you're a leaker, John, they're may say this bill is gonna be two hundred and eighty-three dollars and fifteen cents. We want payment in advance. Now here's where you can catch 'em. "Please send me the copy of the document justifying this expense." What has it done? First of all, they had to do their homework, they had to go and do all this, and they had to come up with a number of copies, 15 cents a page they're allowed, ok, so if you have a thousand pages, that's a hundred fifty dollars. Am I right? Ok, they're allowed 15 cents a page. You really can have fun if you use your head. Ok? And I want to tell you if you really don't like somebody, can't you always find fault with them? My wife says that to me all the time. That's right. Ok. The point I'm trying to make is the more you have them come back and give information to you, we all know that people who work for the IRS are people who couldn't get a job any place else. And their competency level is not normal and it's below normal and these are the kind of people that make our errors. Ok? So we want to catch 'em with all our errors....

Next thing, please send me a copy of the agency request for information and/or documents on my file. I think it would be very helpful if you get these three paragraphs in. You'll be starting to do some damage to them. Please send me copy of all information and documents that your agency has received from other agencies. Including your request for the disclosure. And the date and nature and purpose, purpose of re-quest. Can you see how that's getting snuck in there? Now let's say their gonna go to Jim Newman and say to the Department of Transportation, give us a copy of his driving record. What's the purpose of the request? OK? You see, that's no reason to have a driver's license on a request like that. Or let's just say that the church that Bob Schmidtz belongs to, or what reason is this? OK? There's no reason for any of this. If everybody would send in one of these, I'd think you're really up on them. They wouldn't like it. Do you realize how they hate this privacy act? Can you see what you're gonna do? You're gonna exploit their area here in where we live. So I'm assuming that this is the case. And I might just go duplicate all my stuff and send it to the Regional District office instead of just this district. The Regional office. Not Regional District Office.

*Government Exhibits* 16 (tape recording) & 24 (tape transcript), *Transcript of Proceedings* at 236–237 (June 21, 1984, Vol. 2). Of course, the complete transcript of the general membership meeting of March 6, 1984, also reflects that matters routinely on the agenda of the Wisconsin Society for Educated Citizens are methods for petitioning the United States Tax and District Courts for various forms of tax relief, means of responding to so-called "ninety-day" tax assessment letters, laws for refusing to file state and federal tax returns and to consent to earnings withholdings, and procedures for submitting privacy act claims—all of which are, to some degree, premised on plainly erroneous notions about the practical import and purpose of federal law. *See generally Government Exhibits* 16 (tape recording) & 24 (tape transcript), *Transcript of Proceedings* at 236–237 (June 21, 1984, Vol. 2).

Perhaps the most succinct testimony on the defendant's precise purposes in conducting meetings of the organization was given by Special Agent Lynn Griffin who, with Special Agent Thomas Walkner, became members in an undercover capacity and reported her findings this way:

I think the main purpose [of the Wisconsin Society for Educated Citizens] is to try to circumvent Internal Revenue Service laws, try to stop filing tax returns, try to stop filing W4's, trying to file 1040X forms in order to claim all past income taxes and social security taxes paid in.

I also think its purpose is to file numerous documents with the Internal Revenue Service in order to prevent or to cause the Internal Revenue Service great expense in answering this correspondence and these requests for information for at times information which—Mr. Kaun says ask for information which you know the government doesn't have on you.

If you're a 1099 income earner meaning that you're self-employed and not a W2 wage earner, go ahead and ask for a W4 even though you know you don't have to file a W4 with anybody or go ahead and ask for information on a W4 that you filed even though you know you've never filed a W4 with the Internal Revenue Service.

So I think that over and above their educational purpose, their main purpose is to try to bring the Internal Revenue Service down on its knees.

*Transcript of Proceedings* at 248–249 (June 21, 1984, Vol. 2); *see also Transcript of Proceedings* at 288 (June 21, 1984, Vol. 2) (Special Agent Griffin confirming her belief that the association's members would "use any means possible, illegal or legal to avoid paying taxes").

The nature and scope of the insidious practices promoted by the Wisconsin Society for Educated Citizens are virtually unlimited: those in attendance at a general membership meeting of November 16, 1983, were advised by a Mr. George Arlen, purportedly the national organizer for this movement, not to cooperate with agents of the federal government, not to file tax returns, and not to submit withholding forms to employers—all because the federal government has no taxing authority in the first place. *Transcript of Proceedings* at

89 (June 21, 1984, Vol. 1). At other meetings, members were advised to initiate civil actions seeking to enjoin their employers from requiring the completion of so-called "W–4" forms; they were also encouraged to undertake tactics to harass and intimidate employees of the Internal Revenue Service. *Transcript of Proceedings* at 125–126, 215–216, 220 & 248–250 (June 20–21, 1984, Vols. 1 & 2). Equally disturbing is the potential threat this sorry group poses to the federal judiciary itself, as communicated indirectly by Special Agent Walkner:

There was also a time, I don't know if Mr. Kaun was present, but one of the members made a statement that the best way to serve a suit on a federal judge was to use a Title 45 steel jacketed—jacketed, j-a-c-k-e-t-e-d, which I took to mean a .45 automatic.

*Transcript of Proceedings* at 220 (June 21, 1984, Vol. 2). More generally, the defendant and his progeny apparently encourage the recording of spurious liens on the property of those government officials whose work is inconsistent with the gospel of the Wisconsin Society for Educated Citizens. *Transcript of Proceedings* at 215, 218 (June 21, 1984, Vol. 2). These tactics—in combination with the strong encouragement given those interested in revoking social security numbers, in filing repeated, pointless requests of the government for tax-related information, and in submitting spurious, incomplete, or simply fraudulent tax reports to the Internal Revenue Service—all of this paints a picture of a group hopelessly misled by the sorry beliefs of a disillusioned few—a group wholly bankrupt of any meaningful, community purpose and continuing to play its silly games in a world entirely of its own making.

Left alone in that world, the defendant to this action and the minions he has baptized might appear harmless and not worth the plaintiff's present effort to enjoin their further operation. The real threat they pose, however, to the proper functioning of the Internal Revenue Service springs from their attempts to proselytize other, uneducated citizens in the ways of their associa-

tion, not only through the discussion meetings described at some length above but also through the preparation and sale of numerous documents and miscellaneous publications codifying their beliefs.

Principal among these, of course, is the seminal publication entitled, "Patriot's Pursuit of Happiness," which might best be described as a complete manifesto for the movement. Included among its contents are numerous form letters, sample certificates, and suggested pleadings designed to be used, among other things, for initiating Privacy Act and Freedom of Information Act requests, petitioning for termination of social security numbers, requesting tax refunds, terminating wage and salary withholdings, and seeking tax information from the Internal Revenue Service. The language of a proposed letter to be used in requesting refunds of back taxes is characteristic of both the tone and import of the entire package:

Ref: years _____

Dear Mr. [IRS District] Director:

This year I have studied and learned more about the tax laws and about my own factual circumstances than I have ever known before. As a result of the knowledge I have gained, I have determined that for the year(s) reference [sic] above I did not owe any Federal income tax, even though I incorrectly volunteered and computed a tax, signed a form for return of income, and paid.

Therefore, I am asserting my right to a full refund of all the taxes I paid, whether payment was by withholding, by submission as a quarterly estimate, or by payment accompanying my incorrect returns.

As a basis in fact for this request, I state that I am a natural individual and unenfranchised freeman. I have neither requested, obtained, nor exercised any privilege from an agency of government for the year(s) referenced above....

My studies have taught me that I have been substantially deceived and materially injured by the IRS propaganda that has been issued to me and to others over the years. I did not discover this fraudulent practice of yours until recently. My discovery came after Congress ordered your agency under the Privacy Act of 1974 to disclose some relevant information about your authority, purpose, uses of information, and effects on individuals.

As a victim of your IRS fraud, I am not certain of the effect of any statute of limitations for recovery of the taxes I have erroneously paid. Therefore, I am requesting refunds for only those years shown, even though I was fraudulently induced to pay for many more years further back in time....

I now want to be certain that my old signatures on the erroneous and fraudulently-induced forms that I submitted previously no longer create any liability. I am hereby REVOKING my signature and my prior admission of administrative jurisdiction for each and every one of the year(s) referenced above.

*Government's Exhibit* 1 *Transcript of Proceedings* at 59, 359 (June 20–21, 1984; Vols. 1 & 2).

The organization's assumed role in opposition to the payment of taxes and to the Internal Revenue Service in general is reflected further in its official membership agreement—"The MEMBER states a desire to join WSEC not merely to stop paying taxes..."—in its promotional brochures—"95% of all Americans do not owe any Income Tax. Do you?" or "Are You Being Tricked Into Paying Income Taxes?"—in its sample pleadings—"I hereby demand restitution of the above monies & values by the immediate return thereof with INTEREST and any penalty ..."—and in its own declaration of purpose—"It is believed that officials, agents and advisors of government have knowingly acted and conspired to create pretended titles of nobility, to plunder and steal, to create massive inflation, to enslave the people, to buy patronage with loot, to compromise the country's defenses, to create international entanglements, and to prosecute and jail those political objectors and loyal protes-

tors." *Government Exhibits* 10, 4, 12, & 17, *Defendant's Exhibit* 2, *Transcript of Proceedings* at 118, 120, 124, & 341 (June 20–21, 1984, Vols. 1 & 2).

As the record in this matter reflects, the parties successfully introduced into evidence twenty-seven such spurious or patently frivolous documents. Among the numerous misleading, if not simply fraudulent, representations advanced by these materials are that wages are not income, that filing a federal income tax return is purely voluntary and not required by law, that individuals can lawfully revoke their social security numbers, that tips given to waiter and waitresses are gifts not subject to income tax, and that individuals may claim complete exemption from income taxation on the ground that withholding is voluntary. *See, e.g., Government Exhibits* 28, 29, 12, 20, 21, 24, 13, & 17, *Transcript of Proceedings* at 315–316, 120, 129, 121, & 124. Of course, as indicated above, the truly insidious feature of these materials is not their mere existence but the fact that they are on the market to be freely disseminated or sold by the Wisconsin Society for Educated Citizens. While there is no evidence in the record to suggest that the defendant himself peddled these materials among his group's membership, it is clear that they are readily available for acquisition or purchase by anyone interested in them. *Transcript of Proceedings* at 120–122, 126, 174, 214 (June 20–21, 1984, Vols. 1 & 2).

To further aid in the distribution of these false and fraudulent materials, the defendant and those acting in concert with him use computerized word processing equipment with the apparent capacity to duplicate or produce an assortment of written documents for the general membership of the association. Again, Special Agent Lynn Griffin's testimony with respect to this procedure is especially enlightening:

> ... [T]here was a word processor available, and I felt that you were in control of it and that by paying dues or as I heard a reference in a meeting that this is payment for these things.

So I would say yes, that you were responsible for having these provided to people and encourage their use.... You said if someone wanted a form that they had to fill something out and the next week you would provide them with a form.

> You also said that if someone was filing a Freedom of Information Act request, you would tailor it to their needs. They would fill it out and you would counsel them and help them complete it so that it would fit their specific needs.

*Transcript of Proceedings* at 281–282 (June 21, 1984, Vol. 1). In effect, the defendant's word processing equipment enables association members to secure individually-tailored documents—predictably all of a dubious nature—to be forwarded to or filed with employers, creditors, courts, or the Internal Revenue Service. Generally designed to interfere with the government's ability to enforce the Internal Revenue laws, these documents are typically made available to members upon simple request. *Transcript of Proceedings* at 129, 130–131, & 308–309 (June 20–21, 1984, Vols. 1 & 2).

The upshot of this somewhat elaborate, if fundamentally malefic, system is that taxpaying citizens pay membership fees, publication costs, and other operating expenses to obtain oral and written misinformation about the federal tax system which, if acted upon, could expose them to civil and criminal penalties under 26 U.S.C. § 6700, and other statutory provisions drafted to ensure compliance with the Internal Revenue laws. The mere prospect that more well-meaning, if ill-educated, citizens may fall prey to the superficial appeal of the defendant's message—and, in the process, lose those financial resources that they may have amassed to date, not to mention their heretofore unblemished status as law-abiding citizens—convinces this Court that the defendant's sale of his self-proclaimed, magic elixer must be stopped.

Of course, a concomitant result of the defendant's continuing false prophesy is that the plaintiff itself will incur serious,

irreparable harm to its efforts in enforcing the Internal Revenue laws. Aside from the considerable loss in tax revenues attendant upon the activities or nonactivities of the defendant and his followers, the Internal Revenue Service has been compelled to create a special unit, the sole task of which is to resolve problems presented by so-called "tax protester" antics of the sort promoted by the Wisconsin Society for Educated Citizens. As explained by Mr. Michael O'Brien, Group Manager in the Examination Division of the Internal Revenue Service, the staff of ten agents, whose annual salaries alone together total more than $300,000, respond to numerous, spurious or fraudulent tax returns and other, tax-related documents each year:

> We have numerous problems in regard to taxpayers who have failed to file, who have filed frivolous returns, who file exempt W4's or W4's claiming excessive exemptions. We have amended returns come in, 1040Xs, many different pieces of correspondence....
>
> We get referrals from the Service Center or from employers in the district whereby people have submitted exempt W4's to their employer or W4's with excessive amount of exemptions.
>
> These have to be reviewed for accuracy. Forms have to be sent out. Questionnaires have to be answered, and a determination has to be made on that.... The taxpayer is sent a questionnarie and asked to substantiate the number of allowances that are claimed on the W4 or the exempt status, and that has to be answered to, and if it's not answered to or if the answers do not fit the form, the exemptions, we would process a penalty for that W4.

*Transcript of Proceedings* at 299, 300, & 301 (June 21, 1984, Vol. 2). Plainly, the goal of this special unit is to eliminate the present need for its own existence; by today's order, the Court accepts their implicit invitation to put at least some of their more troublesome clients out of business permanently.

Parenthetically, the ruling announced today should also dampen if not eliminate entirely the penchant of some of the defendant's likely followers—if not the defendant himself—from initiating wholly frivolous civil lawsuits designed solely to harass government officials in the performance of their assigned duties. This Court and the other branches of the Eastern District of Wisconsin have, in recent years, become all too familiar with the abusive litigation tactics employed by these disgruntled citizens in their misguided efforts to challenge the numerous units and agencies of the federal government, including the Internal Revenue Service. It is now clear to this Court that many, if not all, of these ill-begotten, ill-motivated lawsuits sprung directly from the pages of the present defendant's teachings. Cases crafted in the pattern of *Smith v. United States,* Civil No. 83–C–484 (E.D.Wis. Aug. 17, 1984), about which Special Agent Thomas Walkner and others testified, *see, e.g., Transcript of Proceedings* at 228–230 (June 21, 1984, Vol. 2), are no longer viewed by this Court as legitimate exercises of the petitioners' rights to judicial access and deliberation.

In what might best be characterized as the defendant's final sally during the course of the two-day trial in this matter, he described his basic frustration with the federal government this way:

> In a nutshell, [the government should address the individual's need] ... to be left alone, that a person has the freedom to move about and exercise his liberty without intrusions, and there are ever increasing intrusions and regulations and problems with government that a person—in my estimation serves no purpose for a person to be subjected to this, and I believe it was Jefferson said the sum of good government was in essence to allow the people to move freely. That wasn't [sic] his exact words, but that was the essence of what he was trying to say.

*Transcript of Proceedings* at 380 (June 21, 1984, Vol. 2). Based on this claimed interest in personal liberty, the Court fully anticipates an attack on both the substance

and scope of the injunctive order set forth in the concluding paragraphs, perhaps on First Amendment grounds.

■ The simple answer to such a challenge is, of course, that while so-called "freedom of expression" liberties are to be closely safeguarded, commercial speech, such as that practiced by the defendant through the auspices of the Wisconsin Society for Educated Citizens, is not protected when it promotes a patently illegal activity or transaction. *See, e.g., Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 496, 102 S.Ct. 1186, 1192, 71 L.Ed.2d 362 (1982) (upholding ordinance regulating sale of drug paraphernalia); *United States v. Buttorff,* 572 F.2d 619, 624 (8th Cir.1978) (affirming criminal conviction for aiding and abetting others, particularly through verbal incitement, to violate federal tax laws). As the United States Supreme Court stated plainly:

> Truthful advertising related to lawful activities is entitled to protections of the First Amendment. But when the particular content or method of the advertising suggests that it is inherently misleading or when experience has proved that in fact such advertising is subject to abuse, the States may impose appropriate restrictions. Misleading advertising may be prohibited entirely.

*In Re R.M.J.* 455 U.S. 191, 203, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982).

In this case, the numerous tax avoidance schemes promoted by the defendant are so clearly illegal that the United States will surely succeed on the merits against any individual seeking to derive federal income tax benefits through the materials promoted by the Wisconsin Society for Educated Citizens. While the defendant clearly knows that his gospel is fraudulent, he and his followers continue to seek to frustrate the administration and enforcement of the federal tax laws—all to the great, irreparable harm of the Internal Revenue Service and the public it serves.

■ Moreover, there is no evidence whatsoever that, if not prevented from pursuing this troublesome agenda further, they will stop on their own initiative. Indeed, all indications are that they will continue their harassing and destructive activities unless enjoined now. Because the present defendant has plainly engaged in conduct that is subject to civil penalties under 26 U.S.C. § 6700, the Court today finds that injunctive relief is appropriate under 26 U.S.C. §§ 7408 & 7402(a) to prevent the recurrence of the baneful conduct chronicled in this memorandum.

## CONCLUSION

For the numerous reasons set forth herein, the Court hereby GRANTS the petition of the plaintiff, United States of America, for permanent injunctive relief against the defendant, Dennis Kaun, pursuant to Rule 65 of the Federal Rules of Civil Procedure. Specifically, the defendant, Dennis Kaun, individually and doing business as the Wisconsin Society for Educated Citizens, his agents, servants, employees, attorneys, and all those in active concert or participation with them, are hereby ENJOINED, directly and indirectly from engaging or undertaking to engage in any and all of the following activities:

1. Organizing, selling, or assisting in the organization of an entity or otherwise promoting any plan or arrangement based upon (a) the false representation that wages, salaries, or other compensation for labor or services are exempt from federal income taxation, or (b) any other such frivolous claim with respect to the scope of federal income taxation, or (c) any false or fraudulent claim regarding the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit for federal income tax purposes;

2. Advertising, marketing, or selling any documents or other information advising taxpayers that wages, salaries, or other income not specifically excluded from taxation under Title 26 of the United States Code are not taxable income;

3. Providing forms for or assisting any individual in the preparation of false Inter-

nal Revenue Forms W–4, W4E, 1040X, and any other form, return, or declaration claiming that the taxpayer is exempt from federal income taxation or entitled to excessive withholding allowances;

4. Filing, providing forms for, or otherwise aiding and abetting the filing of Freedom of Information requests with the Internal Revenue Service;

5. Filing, providing forms for, or otherwise engaging in aiding and abetting the institution or prosecution of any civil action in any court in the United States of America based upon (a) the claim that wages or salaries or other compensation for labor or services are not subject to federal income tax, or (b) any other such frivolous claim with respect to federal income taxation; and

6. Engaging in any other conduct subject to penalty under Section 6700 of the Internal Revenue Code, Title 26 of the United States Code.

The Clerk of Court is HEREBY DIRECTED to enter judgment accordingly.