**Leroy DAMRON, Plaintiff,**

v.

**YELLOW FREIGHT SYSTEM, INC., Defendant.**

No. 4:97CV–051.

United States District Court, E.D. Tennessee.

June 26, 1998.

Leroy Damron, Shelbyville, pro se.

Anderson B. Scott, Fisher & Phillips, Atlanta, GA, Wade Cowan, Williams & Associates, Nashville, TN, for Defendant.

### MEMORANDUM

EDGAR, District Judge.

Plaintiff Leroy Damron ("Damron") has brought this employment discrimination action seeking damages and injunctive relief pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621—634, and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e—2000e–17. There are three motions before the Court. First, defendant Yellow Freight System, Inc. ("Yellow Freight") moves for summary judgment to dismiss Damron's complaint under FED. R. CIV. P. 56. (Court File No. 23). After reviewing the record, the Court concludes the motion is well taken and it will be **GRANTED.** Damron's complaint will be **DISMISSED WITH PREJUDICE.**

Second, Damron filed a motion on May 13, 1998, to extend discovery. (Court File No. 53). The motion will be **DENIED.** Damron has had more than ample time to complete his pretrial discovery. The Court entered a scheduling order on August 20, 1997, which established May 15, 1998, as the deadline for completing all pretrial discovery. (Court File No. 10). Damron has not given a sufficient reason why the discovery deadline should be extended. Moreover, the motion is moot because the Court has decided to grant Yellow Freight's summary judgment motion and dismiss the complaint. Damron does not contend in his motion that he needs any more time to take discovery for the purpose of responding to Yellow Freight's summary judgment motion.

Third, Yellow Freight has moved to impose sanctions on Damron pursuant to FED. R. CIV. P. 11 for filing a frivolous lawsuit. (Court File No. 25). The Court will **RESERVE** ruling on the motion until it has determined whether Yellow Freight complied with the "safe harbor" provision in Rule 11(c)(1)(A).

### I. Summary Judgment Standard of Review

We begin our analysis with the motion for summary judgment. FED. R. CIV. P. 56(c) provides that summary judgment will be rendered if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The burden is on the moving party to conclusively show that no genuine issue of material fact exists, and the Court must view the facts and all inferences to be drawn therefrom in the light

most favorable to the nonmoving party *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Morris v. Crete Carrier Corp.*, 105 F.3d 279, 280–81 (6th Cir.1997); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943 (6th Cir.1990); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987).

Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party is required to come forward with some significant probative evidence which makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *White*, 909 F.2d at 943–44; *60 Ivy Street*, 822 F.2d at 1435. The moving party is entitled to summary judgment if the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir.1996).

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question, and not to weigh the evidence, judge the credibility of witnesses, and determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *60 Ivy Street*, 822 F.2d at 1435–36. The standard for summary judgment mirrors the standard for directed verdict. The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505; *see also Lapeer County, Mich. v. Montgomery County, Ohio*, 108 F.3d 74, 78 (6th Cir. 1997). There must be some probative evidence from which the jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *Bailey v. Floyd County Bd. Of Educ.*, 106 F.3d 135, 140 (6th Cir.1997). If the Court concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505; *University of Cincinnati v. Arkwright Mut. Ins. Co.*, 51 F.3d 1277, 1280 (6th Cir.1995); *LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).

## II. Facts

The Court has reviewed the record in the light most favorable to Damron and makes the following findings of fact. Damron is a citizen of Tennessee who currently resides in Shelbyville, Tennessee. He was born in Detroit, Michigan, on August 1, 1943, and is a natural born United States citizen. Yellow Freight is a national trucking corporation and interstate common carrier doing business in Tennessee whose hourly employees are represented by the International Brotherhood of Teamsters union.

Damron was initially hired by Yellow Freight at its Nashville, Tennessee terminal on October 10, 1992, when Damron was 49 years old. He was employed in the position of casual truck driver. The decision to hire Damron was made by Yellow Fright's Nashville Linehaul Manager Leonard Foster ("Foster"). Foster was also the person who subsequently made the decision over two years later on February 23, 1995, to terminate Damron's employment as a casual driver.

Casual truck drivers work for Yellow Freight on a part-time basis, as needed. Whenever freight volume is heavy or regular drivers are not available, Yellow Freight contacts its casual drivers to work. The procedure for calling Damron and the other casual drivers was dictated by Yellow Freight's contract with the Teamsters union. Yellow Freight explains the standard procedure as follows. Each casual driver fills out a "T-card" indicating when he or she can be available for work. When Yellow Freight has a need for casual drivers, it telephones the persons who have indicated their availability. Any casual driver who either does not accept a work assignment when offered or is not available as indicated on their T-card is

moved or rotated to the bottom of the call-list thereby making it less likely that he or she will be called again by Yellow Freight in the future. Casual drivers who are repeatedly unavailable are dropped or removed from the list and are no longer offered work assignments.

The system for assigning casual drivers is designed under the terms of the union contract to ensure maximum work for regular, full-time drivers. Yellow Freight emphasizes that when it perceives a need for casual drivers, it only has an hour-long window of opportunity known as a "call block" to contact the casual drivers and promptly make arrangements for them to report for work. After the one hour call block expires, Yellow Freight is required to wait three hours to ascertain whether any of its regular drivers will finish their federally mandated rest periods and report for work. Only at the end of this three-hour waiting period does Yellow Freight have another call block to contact needed casual drivers.

According to Yellow Freight, the consequences of not obtaining enough casual drivers during the first call block to drive waiting freight trucks are severe. It means that a truck may be delayed for as much as four hours while Yellow Freight's dispatchers wait the three-hour period required by the union contract to ascertain the availability and status of regular drivers before starting the next call block to find available casual drivers. Yellow Freight operates a hub and spoke system where freight is relayed from terminal to terminal. Its trucking runs are timed so that inbound freight can be promptly distributed to outbound trailer trucks which then depart on their leg or portion of the relay. For example, a freight delay in Yellow Freight's terminal in Nashville, Tennessee, means that trucks at other terminals will also be delayed while they wait for the trucks from Nashville to arrive.

Failure to obtain a casual driver during the first call block can have a domino-effect and spread delay throughout Yellow Freight's delivery system. Because of the one-hour time constraint and restriction on the call block, the adverse effects of not quickly obtaining enough drivers, and the large number of casual drivers who occasionally are needed, Yellow Freight's dispatchers are often very rushed and hurried during the call blocks. The dispatchers must obtain the necessary number of casual drivers as soon as possible or the delivery of freight to customers may be substantially delayed. Based on these circumstances, Yellow Freight dispatchers often do not have time to leave messages for casual drivers on telephone answering machines or pagers. Dispatchers often treat anything other than immediate contact with a live person by telephone as the equivalent of the casual driver not being available. The unavailable casual driver's T-card is consequently moved to the bottom of the call list.

Moreover, there is no guarantee that a casual driver will receive a telephone call from a Yellow Freight dispatcher even when the driver happens to be available. Under the union contract, regular drivers have priority and they can "bump" casual drivers during a call block even though the casual drivers might be near the top of the list for a work assignment. Various other factors directly affect whether casual drivers receive work including freight volume, how many regular drivers are available, and the number of casual drivers that Yellow Freight has working for it at any given time.

With this background in mind concerning Yellow Freight's standard procedures for assigning work to its casual drivers, we now turn to the particular facts and circumstances in Damron's case. In February 1993, shortly after he was hired, Damron gave Yellow Freight a copy of a letter dated February 26, 1993, that he had written to Lloyd Bentsen, Secretary, United States Department of the Treasury, in Washington, D.C. Attached to the letter was a document signed by Damron captioned "AFFIDAVIT OF REVOCATION AND RECISSION." The affidavit purported to exempt Damron from any legal responsibility to file federal income tax returns and pay federal income taxes. Damron also proclaimed in the affidavit that he was a "natural born free sovereign United States citizen." The document said Damron was exercising his right to revoke, rescind, cancel, and render null and void, both currently and retroactively to the time

of execution, all Internal Revenue ("IRS") forms, schedules and other documents ever signed by Damron including his application to the United States government for a Social Security number. Damron contended he had a right to take such action because the United States Congress and the IRS are guilty of constructive fraud by misleading and deceiving Damron into believing that he was required to pay federal income taxes. Furthermore, Damron declared that he was not and never had been a "taxpayer" as that term is defined by the IRS.

Damron's contention that he was not a taxpayer subject to IRS jurisdiction was frivolous and not in accord with the law. *Beerbower v. United States*, 787 F.2d 588 (Table) 1986 WL 16750, at * 2 (6th Cir. Mar.14, 1986); *Martin v. Commissioner of Internal Revenue*, 756 F.2d 38, 40 (6th Cir.1985). It is clear from this February 26, 1993 correspondence that Damron chose to follow a course of conduct which may accurately be described as "tax protester." *See, e.g., United States v. Kaun*, 633 F.Supp. 406, 416 (E.D.Wis.1986); *Kish v. C.I.R.*, T.C. Memo 1998-16, 1998 WL 7747, 75 T.C.M. (CCH) 1571, T.C.M. (RIA) 98,015 (U.S.Tax Ct. Jan.13, 1998); *Cloutier v. C.I.R.*, T.C. Memo 1994-558, 1994 WL 604081, 68 T.C.M. (CCH) 1165, T.C.M. (RIA) 94,558 (U.S.Tax Ct. Nov.3, 1994). Damron's basic philosophy is that the signing and filing of federal tax returns with the IRS, an agency of the United States government, are merely acts of voluntary compliance with federal tax laws which may be unilaterally revoked by natural born United States citizens at their whim. Damron adopted this misguided philosophy and misinterpretation of the law from a tax protest organization known as the Save–A–Patriot Fellowship.[1] In his affidavit (Court File No. 39), Damron states he believes the federal income tax is constitutional and that he has never protested any tax. Damron's statement flatly denying that he has ever protested any tax is not true and is belied by the "AFFIDAVIT OF REVOCATION AND RECISSION" he wrote to the Secretary of the United States Treasury and his other actions.

The purpose of delving into Damron's unusual beliefs and activities as a tax protester is to explain the factual background and better comprehend the unique nature of Damron's employment relationship with Yellow Freight. This is a legitimate topic of discussion because Damron in his complaint alleges that he has been subjected to unlawful discrimination by Yellow Freight in violation of Title VII based on his national origin as a natural born American citizen as a result of Damron's efforts to revoke or rescind his Social Security number.

Damron took an especially strong position on the subject of Social Security numbers. According to Damron, Social Security numbers are for use only by foreign aliens and are not legally required of natural born United States citizens. In conjunction with giving Yellow Freight a copy of his affidavit of revocation and recission sent to the United States Treasury Secretary, Damron demanded and insisted that Yellow Freight stop using his Social Security number on all official business documents. (See File No. 1, Complaint, ¶ 5). Damron contends this is when Yellow Freight first began to discriminate against him by not giving him work as a casual driver. In other words, it is alleged that Yellow Freight's discrimination against Damron was motivated in large part by its displeasure with having to deal with Damron's tax protester activities and his various attempts to revoke his Social Security number.

The Court finds that Damron's position regarding his demands to revoke and rescind his Social Security number was frivolous and not objectively reasonable under existing federal law. Yellow Freight points out in its memorandum of law (Court File No. 24, p. 5 n. 2), that Damron has gotten the law exactly backwards with regard to who is required by law to have a Social Security number for tax purposes. 26 U.S.C. § 6109(a) provides that those persons filling out federal tax forms are required to use and provide their "taxpayer identification number" to the IRS. Section 6109(a) and (d) also expressly

1. The nature and policies of this tax protest organization are discussed in *Save–A–Patriot Fellow-* *ship v. United States*, 962 F.Supp. 695 (D.Md. 1996).

provide that the identifying number of an individual shall be his Social Security account number, except as shall be otherwise specified under federal administrative regulations by the United States Secretary of the Treasury. Therefore, United States citizens filing federal tax returns or forms are required to provide their Social Security numbers to the IRS on their tax forms. There is an exception for foreign aliens who are not assigned Social Security numbers and are instead assigned alternate tax identification numbers by the IRS. 26 C.F.R. § 301.6109–1(d)(3) and (g)(iii). Thus, whenever Damron files his individual federal income tax returns with the IRS, he must by law use his Social Security number. When Damron's employers and his banks report tax information to the IRS concerning income earned by Damron, they are also required by law to use Damron's Social Security number as constituting his taxpayer identification number. Furthermore, 31 C.F.R. § 316011(b)–2(a)(ii) provides that every employee who is subject to the withholding of federal income tax from wages is required to have a Social Security number.

The Court is also familiar with 42 U.S.C. § 405(c) which provides that the Commissioner of Social Security shall establish and maintain certain records concerning the amount of wages paid to, and the amounts of self-employed income derived by, each individual. 42 U.S.C. § 405(c)(2)(A). In carrying out these duties under § 405(c)(2)(A), the statute provides that the Commissioner of Social Security shall take affirmative measures to assure that Social Security account numbers will, to the maximum extent practicable, be assigned to all members of appropriate groups or categories of individuals. Among the groups enumerated to be assigned Social Security account numbers are aliens at the time of their lawful admission to the United States either for permanent residence or under authority of law permitting them to engage in employment in the United States and other aliens at such time as their status is so changed as to make it lawful for them to engage in employment in the United States. It is clear from the text of § 405(c) that Congress intends for the Commissioner of Social Security to take action to issue Social Security account numbers to every individual person who is employed in the United States including United States citizens and aliens.

Damron has not cited and the Court through independent research has not found any competent legal authority which allows Damron to unilaterally rescind and revoke his Social Security number at his discretion once it has been issued to him by the Commissioner of Social Security, especially where Damron admits he is gainfully employed within the United States and has been earning wages. This Court has located decisions by some courts in other jurisdictions which are adverse to Damron's position. *Valldejuli v. Social Security Administration,* 1994 WL 912253 (N.D.Fla. Dec.20, 1994); *Kaun,* 633 F.Supp. at 416; *Birt v. Consolidated School Dist. No. 4,* 829 S.W.2d 538, 542–43 (Mo.Ct. App.1992). Moreover, the Supreme Court has recognized that individual participation in the Social Security system is mandatory rather than voluntary. Voluntary participation would be difficult, if not impossible, to administer. Mandatory participation is indispensable to the fiscal vitality of the Social Security system. *United States v. Lee,* 455 U.S. 252, 258, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982); *see also Valldejuli,* 1994 WL 912253, at *2.

During early 1993, Damron submitted a W–4 federal income tax withholding form to Yellow Freight claiming a total of eleven (11) dependents or allowances. Damron actually has only four children and a wife. At the time Damron filled out the W–4 form, some of his grown children had already left home and were no longer his dependents for federal tax purposes. This is another form of tax protest. *See United States v. Stefan,* 820 F.2d 1226, (Table) 1987 WL 37740 (6th Cir. June 16, 1987) (tax protester falsely listed 31 alleged allowances on his W–4 federal tax withholding form). Damron readily concedes that the reason he claimed the extraordinarily large number of dependents or allowances on his W–4 form was to avoid the withholding of federal income taxes from his paychecks by his employer, Yellow Freight.

On March 19, 1993, Damron gave a document to Yellow Freight captioned, "Claiming to be a person not subject to withholding." Damron asserted that this document prohibited Yellow Freight from withholding federal income taxes from his paychecks. In response, Yellow Freight informed Damron that it had no choice but to comply with the federal tax laws and withhold appropriate amounts from his wages for taxes.

In August, 1994, Yellow Freight received from the IRS a tax levy seeking $86, 605.18 in back taxes, penalties and interest owed by Damron. The IRS levy instructed Yellow Freight to garnish Damron's wages. In accordance with the tax levy, Yellow Freight began deducting $562.12 per pay period from Damron's wages and forwarding the money to the IRS pursuant to 26 U.S.C. §§ 6331 and 6332.

When Damron learned about the IRS tax levy and garnishment in mid-September, Damron wrote a letter dated September 25, 1994, to attorney Dan Hornbeck, corporate counsel for Yellow Freight. In this letter Damron vehemently denied that he owed any federal income taxes. Damron stated the IRS notice of tax levy was fraudulent and Yellow Freight was not required to honor or comply with the levy. Damron further said that Yellow Freight did not have the authority to garnish his wages to pay the federal tax levy without either Damron's consent or a warrant of distraint. Damron asserted that by handing his wages over to the IRS, Yellow Freight had violated his unspecified civil rights and constitutional rights under federal and state law. Damron said he had the right to file criminal charges against Yellow Freight as well as seek a civil remedy. Finally, Damron demanded that Yellow Freight return the money with interest to him immediately or else he would resort to all legal means available to him to take action against Yellow Freight.

Yellow Freight correctly explained to Damron that the company had a legal obligation to comply with the IRS tax levy. *See* 26 U.S.C. § 6332. On September 8, 1995, Damron filed a civil complaint in the Circuit Court of Bedford County, Tennessee, styled *Leroy Damron v. Yellow Freight System,* *Inc., Jeri Ellison, and Carol Herthel,* Civil Action File No. 7301. Although the suit was filed after Damron was discharged from employment by Yellow Freight, it is relevant to give a complete picture of their employer-employee relationship. Damron claimed that the defendants had: (1) violated his constitutional rights to privacy and due process of law; and (2) committed a fraudulent conversion or theft of his property. In this suit, Damron also alleged that the defendants had deprived him of his wages without his permission or a lawful court order, had honored a false instrument in that the IRS tax levy was false on its face, and had acted in bad faith by not responding to Damron's telephone calls and letters made by him in a diligent effort to resolve the dispute. It was part of Damron's complaint that the IRS notice of levy was merely a notice and not an actual levy on or seizure of his wages. Thus, Damron alleged Yellow Freight incorrectly assumed that it had to garnish his wages and disburse the funds to the IRS when in fact Yellow Freight was without any legal obligation to do so. The complaint was ultimately dismissed by the Bedford County Circuit Court and Damron has filed an appeal in the Tennessee courts which remains pending.

In the meantime, Yellow Freight began to experience significant problems starting in the Summer of 1994 being able to find and contact Damron at times when he said he would be available for work as a casual truck driver. Yellow Freight tried to call Damron on various occasions to offer him work assignments but Damron either did not answer the telephone calls or he declined to work. As part of its customary office policy and standard procedures concerning the retention of records, Yellow Freight purged some of its older files and it has not kept all of its records showing each and every time that Yellow Freight made such telephone calls to Damron. Once it became apparent to Yellow Freight that it was having a recurrent problem with Damron regarding his availability for work as a casual driver, Yellow Freight did begin to retain such telephone call records. Yellow Freight has submitted copies of some T-cards (Court File No. 24, Exhibit L) indicating a portion of the occasions when

Damron either did not answer telephone calls or he declined the opportunity to work during the time period of July—September, 1994.

In his affidavit, Damron asserts he was ready and available for dispatch as a casual driver when he said he would be available. Damron acknowledges, however, that he was working as a casual driver for another trucking company, Roadway Express, during the same period of time in question. Several times Damron arrived home after working for Roadway Express only to find telephone messages from Yellow Freight. Most calls were made by Yellow Freight to Damron in the middle of the night and on weekends, and Damron contends he was familiar with the pattern so he generally knew when to expect calls. Damron also says that many times Yellow Freight dispatchers left messages on his answering machine and Damron would return the calls. However, Damron has not and cannot affirmatively state he was available every single time Yellow Freight sought to contact him. There may have been various occasions when Yellow Freight dispatchers telephoned Damron's residence, but Damron was not there and the dispatcher did not leave a message on his telephone message recording machine. Just because the Yellow Freight dispatchers left some telephone messages on Damron's answering machine does not mean that they always left messages. As Yellow Freight has explained, sometimes its dispatchers were very rushed for time and in a great hurry to locate casual truck drivers during a call block so that the dispatchers did not always leave telephone messages for Damron and other casual drivers. In these situations, anything except immediate contact with the casual driver was treated as the person being "not available" and the driver's T-card was moved to the bottom of the call list.

Damron has submitted copies of billing records from his home telephone number for the following months: (a) August—October 1993; (b) June—October, 1994; and (c) December 1994—May 1995. According to Damron, these records show that he made numerous calls to a telephone number (615–350–5768) maintained by Yellow Freight.

These calls placed by Damron typically lasted one minute or less. Yellow Freight maintained a recorded message or dispatch report that drivers could call to check on the status and availability of work without having to speak directly with and bother or interrupt the dispatchers. Although his telephone billing records show that Damron called the dispatch report telephone number with some frequency to check the recorded message and determine whether there was a good possibility that Yellow Freight might be needing some casual drivers at any given time, these records do not tend to prove whether Damron was actually available to work when Yellow Freight did try to contact him.

Yellow Freight says that due to Damron's unavailability to work when called, Damron's supervisor, Leonard Foster, made the decision on February 23, 1995, to delete Damron from the casual driver list along. After reviewing Damron's affidavit, the Court concludes that Damron has not presented sufficient probative evidence to show there is a material issue of fact in dispute whether Yellow Freight's proffered reason for its decision to terminate Damron as a casual driver was false or a mere pretext for unlawful discrimination. As a result, effective February 23, 1995, Damron was no longer eligible for work with Yellow Freight as a casual driver and he also would not be considered for hire as a regular employee. To be eligible for work again as a casual driver, Damron would have to complete a new job application which he did not do. Yellow Freight, unfortunately, did not notify Damron that he was being dropped as a casual driver. Thus, after February 23, 1995, Damron continued to mistakenly believe he was still on the casual driver list which in retrospect created unnecessary confusion.

On April 24, 1995, Damron telephoned Phil Hinkle ("Hinkle"), Linehaul Operations Manager for Yellow Freight, to complain about not being called for work. Hinkle replied he did not know the reason why Damron was not being called. Hinkle said he would check into the matter and call Damron back. Hinkle talked with Foster and learned that Damron had been deleted from the casual driver

list due to his pattern of unavailability. Hinkle says he then promptly placed two telephone calls to Damron's residence on April 26 and May 2, 1995, to explain the situation but Damron was not available to answer these calls. Damron denies that Hinkle made any such telephone calls to his residence because Damron had a telephone caller identification machine that would have indicated the source of the incoming calls. The Court finds it is immaterial whether Hinkle did or did not attempt to communicate with Damron by telephone on April 26 and May 2, 1995. The key fact is that Foster made the decision to terminate Damron as a casual driver on February 23, 1995, and Damron has not come forward with any probative evidence to refute Foster's affidavit on this crucial point.

Damron subsequently wrote a letter to Hinkle on May 9, 1995, asking for an explanation. The letter stated in relevant part:

My card has disappeared several times over the last year, without explanation. Since last Summer, I have seldom been called for work and have not been called now since December 23, 1994. I have not received notification of being fired.

Because of the lack of work offered to me, and the fact that I was the only casual not put on regular in July 1993, I assume that there is some type of discrimination against me. I intend to pursue this with the union, (who has failed me in this already), so it will probably be necessary to involve the Equal Employment Opportunity Commission. I am also prepared to take appropriate legal action if necessary.

Damron's May 9, 1995 letter to Hinkle does not mention or identify the specific type and nature of the employment discrimination being alleged by Damron. Hinkle wrote a letter in reply to Damron dated May 16, 1995, stating that Damron was no longer being considered for employment by Yellow Freight. Damron considered Hinkle's letter of May 16, 1995, to be retaliatory. Thus, Damron filed an administrative complaint with the Equal Employment Opportunity Commission ("EEOC") on or about June 15, 1995, wherein he charged Yellow Freight with: (1) discrimination in violation of Title VII on the basis of his national origin and race, Caucasian/white; (2) age discrimination in violation of ADEA, age 51 at the time of his discharge; and (3) retaliation for having told Yellow Freight that he was contacting EEOC about the alleged discriminatory employment practices. The EEOC investigated the charges and determined there was insufficient cause to take any action against Yellow Freight.

Damron was dissatisfied with the results of the EEOC investigation. On October 3, 1996, he wrote a letter to Barbara Vaughn, an EEOC investigator in Nashville, Tennessee. In numbered paragraph 8 of this letter (Court File No. 24, Exhibit S), Damron discussed the basis for his Title VII complaint of employment discrimination due to his national origin as a natural born United States citizen. Damron stated:

I was also discriminated against because of my national origin. They [Yellow Freight] worked me quite a bit from October 1992 to July 1993. When they found out I had no social security number I was not called very much. In July of 1993 every casual was put on regular EXCEPT me because I was the oldest and had no [Social Security] number. An American Citizen is not required to have a social security number, but a foreign alien is. This is clear discrimination as to national origin because an alien is preferred because he has a number.

The Court notes that Damron's statement of the facts and chronology of events in this quoted paragraph is not entirely accurate. In truth and fact, the record shows that Damron initially began to have a dispute with Yellow Freight regarding his Social Security number in February 1993. Therefore, Yellow Freight at the very least continued to give Damron, by his own admission, a substantial amount of work as a casual truck driver up until July 1993, even after Damron created the fallacious dispute about his Social Security number in February 1993.

### III. Analysis—Summary Judgment Motion

#### A. Failure to Hire or Promote As Regular Driver: Time Limit For Filing Complaint With EEOC

Damron contends that by August 1, 1993, all other casual drivers except him were in

effect promoted and hired as regular drivers by Yellow Freight. Damron was aware of and knew about this issue in or about August 1993. In his administrative complaint to the EEOC, Damron raised the failure-to-hire claim or failure-to-promote claim under both Title VII and ADEA. The Court will analyze the claim pursuant to Title VII and ADEA. The Court concludes this particular discrimination claim is time-barred by the applicable statute of limitations and will be dismissed because Damron failed to properly exhaust his available administrative remedies. Damron did not file his charge with the EEOC making this specific complaint until June 15, 1995, which is almost two years after the August 1993 date when the discrimination is alleged to have occurred and the claim accrued.

■ For purposes of asserting a claim under Title VII, this charge of employment discrimination was required to be filed by Damron directly with the EEOC within 180 days of the alleged discriminatory event. 42 U.S.C. § 2000e–5(e). Damron did not file this particular Title VII claim directly with the EEOC within the 180–day time limit as required by § 2000e–5(e). In the alternative. Damron could have filed his complaint with the Tennessee Human Rights Commission within 240 days from the date of the alleged discriminatory event pursuant to the Tennessee Human Rights Act, TENN. CODE ANN. §§ 4–21–104—4–21–401. The 240–day time limit in deferral states such as Tennessee is derived from reading 42 U.S.C. § 2000e–5(c) and (e) together. The 240–day time limit for filing employment discrimination claims with state agencies is explained in *EEOC v. Commercial Office Products Co.*, 486 U.S. 107, 110–11, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988), and *Brown v. Crowe*, 963 F.2d 895, 896 (6th Cir.1992). However, Damron never filed a complaint with the Tennessee Human Rights Commission, therefore, the alternative 240–day time limit provided in 42 U.S.C. § 2000e–5(c) and (e) is not applicable. Accordingly, the Title VII claim of failure to hire or failure to promote to regular driver status is time-barred and will be **DISMISSED.**

■ The same result is reached under ADEA which has a 300–day time limit for filing complaints with the EEOC comparable to Title VII. To the extent Damron asserts the failure to hire or failure to promote claim under ADEA, the claim is likewise time-barred by the statute of limitations. 29 U.S.C. § 626(d) of ADEA provides that in States such as Tennessee, which have their own laws forbidding age discrimination, the plaintiff must file his age discrimination claim with the EEOC within 300 days after the alleged unlawful practice occurred. *Jackson v. Richards Medical Co.*, 961 F.2d 575, 578 (6th Cir.1992); *Janikowski v. Bendix Corp.*, 823 F.2d 945, 947 (6th Cir.1987); *LaCroix v. Detroit Edison Co.*, 964 F.Supp. 1144, 1148 (E.D.Mich.1996). The Court finds that Damron did not file his failure to hire or failure to promote to regular driver status claim with the EEOC under ADEA within the 300–day time limit. This ADEA claim will be **DISMISSED.**

■ The filing of a timely charge of employment discrimination with the EEOC is not a jurisdictional prerequisite to bringing suit in federal court, but rather is a requirement analogous to a statute of limitations and is subject to waiver, estoppel, and equitable tolling. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982); *Sabouri v. Ohio Dept. of Educ.*, 1998 WL 57337 (6th Cir. Feb.2, 1998); *Cantrell v. Knoxville Community Development Corp.*, 60 F.3d 1177, 1179 (6th Cir. 1995); *Brown*, 963 F.2d at 899; *Puckett v. Tennessee Eastman Co.*, 889 F.2d 1481, 1486 (6th Cir.1989); *Wright v. State of Tennessee*, 628 F.2d 949 (6th Cir.1980); *LaCroix*, 964 F.Supp. at 1148. In the instant case, there are no grounds for applying the judicial doctrines of waiver, estoppel, and equitable tolling.

### B. Estoppel and Equitable Tolling

■ Equitable estoppel can arise where the defendant employer has taken active steps to prevent or deter the plaintiff employee from timely filing a complaint, for example promising not to plead the statute of limitations. *E.E.O.C. v. Kentucky State Police Dept.*, 80 F.3d 1086, 1095 (6th Cir.), *cert.*

*denied,* —— U.S. ——, 117 S.Ct. 385, 136 L.Ed.2d 302 (1996); *Leake v. University of Cincinnati,* 605 F.2d 255, 259 (6th Cir.1979). The record shows that Damron is the person who is at fault for not filing his complaint with the EEOC within the applicable time limits. There is no proof that Yellow Freight took any action to prevent Damron from investigating and timely filing his complaint with the EEOC which would justify estoppel. *Cf. Rose v. Dole,* 945 F.2d 1331, 1336 (6th Cir.1991).

Equitable tolling is distinguishable from the doctrine of equitable estoppel. Equitable tolling permits a plaintiff to avoid the bar of the statute of limitations if despite all due diligence, he is unable to obtain vital information bearing on the existence of his claim. *Kentucky State Police,* 80 F.3d at 1095; *Cada v. Baxter Healthcare Corp.,* 920 F.2d 446, 451 (7th Cir.1990), *cert. denied,* 501 U.S. 1261, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991); *Campau v. Orchard Hills Psychiatric Center,* 946 F.Supp. 507, 511 (E.D.Mich. 1996). As a general rule, resort to equitable grounds to toll statutes of limitation is very much restricted and the doctrine of equitable tolling is to be carefully applied. *Arens v. G.R. Mfg. Co.,* 968 F.2d 603, 605 (6th Cir. 1992); *Andrews v. Orr,* 851 F.2d 146, 151 (6th Cir.1988); *Wilson v. Grumman Ohio Corp.,* 815 F.2d 26, 28 (6th Cir.1987); *Geromette v. General Motors Corp.,* 609 F.2d 1200, 1203 (6th Cir.1979), *cert. denied,* 446 U.S. 985, 100 S.Ct. 2967, 64 L.Ed.2d 841 (1980).

The Sixth Circuit has articulated five factors to consider when determining whether it is appropriate to equitably toll a statute of limitations: (1) the plaintiff's lack of actual notice; (2) the plaintiff's lack of constructive knowledge; (3) the plaintiff's diligence in pursuing his rights; (4) absence of prejudice to the defendant; and (5) the plaintiff's reasonableness in remaining ignorant of his rights. *Kentucky State Police,* 80 F.3d at 1094; *Rose,* 945 F.2d at 1335; *Andrews,* 851 F.2d at 151; *LaCroix,* 964 F.Supp. at 1148. In the present case, Damron had actual notice in August 1993, that he was not being hired or promoted by Yellow Freight to the job of regular driver. Equitable tolling is inappropriate where the plaintiff has actual or constructive notice of his rights. *Jackson,* 961 F.2d at 579; *Campau,* 946 F.Supp. at 511.

Damron also failed to exercise reasonable diligence in investigating and pursuing this claim through the EEOC in a timely manner. *Jackson,* 961 F.2d at 579–80; *LaCroix,* 964 F.Supp. at 1148–50; *Campau,* 946 F.Supp. at 512–13. The Sixth Circuit has said that courts cannot permit an aggrieved employee aware of his general rights to sit on those rights until he leisurely decides to take action. This would be inconsistent with and undermine the policy of encouraging the expeditious, nonjudicial resolution of employment discrimination disputes through the administrative process established by Congress, *i.e.,* the EEOC. *Jackson,* 961 F.2d at 580. The Sixth Circuit in *Jackson* rejected the argument that excusable ignorance of the law should equitably toll the statute of limitations on an ADEA claim. *Id.*

The Sixth Circuit has also discussed equitable tolling in the context of fraudulent concealment. *Hill v. U.S. Dept. of Labor,* 65 F.3d 1331, 1335–36 (6th Cir.1995); *Jarrett v. Kassel,* 972 F.2d 1415, 1423–24 (6th Cir. 1992), *cert. denied,* 507 U.S. 916, 113 S.Ct. 1272, 122 L.Ed.2d 667 (1993); *Campbell v. Upjohn Co.,* 676 F.2d 1122, 1126 (6th Cir. 1982); *Dayco Corp. v. Goodyear Tire & Rubber Co.,* 523 F.2d 389, 394 (6th Cir.1975). These cases hold that the running of a statute of limitations may be equitably tolled if the plaintiff proves the following three elements to establish fraudulent concealment: (1) the defendant took affirmative steps to conceal the plaintiff's cause of action; (2) the plaintiff failed to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) the plaintiff could not have discovered the cause of action despite exercising due diligence. *Hill,* 65 F.3d at 1335; *Jarrett,* 972 F.2d at 1423. Some courts have observed that fraudulent concealment is frequently mislabeled as "equitable tolling" when it is actually part of the doctrine of equitable estoppel. *Cada,* 920 F.2d at 451; *Campau,* 946 F.Supp. at 512 n. 8; *Allen v. Diebold, Inc.,* 807 F.Supp. 1308, 1314 (N.D.Ohio 1992), *aff'd,* 33 F.3d 674 (6th

Cir.1994). In any event, Damron has not shown fraudulent concealment on the part of Yellow Freight. There is no proof offered that Yellow Freight engaged in any fraudulent conduct deliberately designed to conceal the material facts underlying Damron's failure-to-hire or failure-to-promote claim. Damron was well aware in August 1993, of the operative facts that are the basis for his cause of action.

■ To completely dispose of the estoppel and equitable tolling issues, it is necessary to determine whether certain portions of the record may be taken into consideration when ruling on Yellow Freight's summary judgment motion. Damron states in his affidavit (Court File No. 39) that in July 1993, a Yellow Freight employee named Kim Carroll gave him a drug screen test kit and instructed Damron to go to the clinic to take the drug screen test. Damron asserts Kim Carroll told him this was a pre-employment test because Yellow Freight had decided to hire all casual drivers as regular drivers. Damron interpreted this to mean that Yellow Freight was preparing to hire him as a regular driver. Kim Carroll was employed by Yellow Freight as a secretary and she was not a manager or supervisor.

Damron successfully passed the drug screen test but he was not subsequently hired as a regular driver in August 1993. When he was unable to get an explanation from Yellow Freight as to the reason why he was not being hired as a regular driver, Damron contacted his union business agent, Tommy Barnes ("Barnes"). According to Damron, Barnes checked into the matter and told Damron it had been an "oversight." Barnes was supposed to have talked with a Yellow Freight supervisor named Barney. It is alleged Barnes promised that Damron would be promoted soon to regular driver status. It is not clear from the record as to the precise dates when Damron is alleged to have had these oral conversations with Barnes. It appears these conversations between Damron and Barnes must have occurred sometime prior to Damron's correspondence with Peter Cheng, President and Business Manager of Teamsters Local Union No. 480, in December, 1994.

In any event, Damron's statements about his alleged conversations with Kim Carroll and Tommy Barnes do not provide a basis for this Court to apply the doctrines of estoppel and equitable tolling for the following reasons. First, any statements that may have been made to Damron by Kim Carroll are of minimal or no value since she was not a manager or supervisor and she was not in a position to with speak with authority on behalf of Yellow Freight. Kim Carroll had no real or apparent authority to promise or offer Damron a job with Yellow Freight as a regular driver. Second, in August, 1993, Damron realized he had not been hired as a regular driver and he was effectively on notice that anything Kim Carroll may have previously said was not necessarily true and correct. Damron realized there was a problem with his being hired as a regular driver because he contacted his union representative, Barnes, to complain and he asked Barnes to investigate. Third, Barnes was a union representative and did not represent Yellow Freight management. Barnes had no authority on behalf of Yellow Freight to promise Damron a job as a regular driver. At no time does Damron ever assert that he spoke directly with a Yellow Freight manager or supervisor who promised a job to Damron as a regular driver.

■ Fourth, in his affidavit Damron contends certain oral statements were made to him by Kim Carroll and Barnes to the effect that Damron was going to be hired as a regular driver by Yellow Freight. The Court concludes that any effort by Damron to relate the content of such statements made to him by these other persons constitutes rank hearsay which is not admissible evidence under Rules 801 and 802 of the FEDERAL RULES OF EVIDENCE. The Court cannot take Damron's account of what these other persons are alleged to have told him into consideration when ruling on the summary judgment motion. FED. R. CIV. P. 56(e) requires that Damron's affidavit be made on personal knowledge and it shall set forth such facts as would be "admissible in evidence." The Sixth Circuit has held that inadmissible hearsay evidence cannot be considered by federal courts on motions for sum-

mary judgment under Rule 56. *North American Specialty Ins. Co. v. Myers,* 111 F.3d 1273, 1283 (6th Cir.1997); *Wiley v. United States,* 20 F.3d 222, 225–26 (6th Cir. 1994).

Damron has not submitted either the sworn affidavits or depositions of Kim Carroll and Barnes to establish and corroborate the content of any oral statements they may have made to Damron. Consequently, there is no proof in the present record admissible into evidence under the FEDERAL RULES OF EVIDENCE which shows that Yellow Freight engaged in any deceptive, misleading or fraudulent misconduct causing Damron to falsely believe he was going to be hired as a regular driver. Thus, the doctrines of estoppel and equitable tolling are not applicable and do not provide Damron with any relief from the time limits for filing his Title VII and ADEA failure-to-hire or failure-to-promote complaint with the EEOC.

### C. Continuing Violation

 Damron argues that his complaint to the EEOC was properly filed within the time limitation periods because there was a continuing violation by Yellow Freight on the failure-to-hire claim. The nature and purpose of the continuing violation theory are explained in *Haithcock v. Frank,* 958 F.2d 671, 677–78 (6th Cir.1992). Where there is an ongoing, continuous series of discriminatory acts by an employer, they may be challenged in their entirety by the plaintiff employee as long as one of the continuing discriminatory acts falls within the limitations period. *Id.* at 677; *see also Havens Realty Corp. v. Coleman,* 455 U.S. 363, 365, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); *Gallagher v. Croghan Colonial Bank,* 89 F.3d 275, 278 (6th Cir.1996); *Gibb v. Kemp,* 999 F.2d 539 (Table) 1993 WL 265161, at **3 (6th Cir. July 15, 1993); *Dixon v. Anderson,* 928 F.2d 212, 215–18 (6th Cir.1991); *Hull v. Cuyahoga Valley Bd. of Educ.,* 926 F.2d 505, 510–11 (6th Cir.), *cert. denied,* 501 U.S. 1261, 111 S.Ct. 2917, 115 L.Ed.2d 1080 (1991); *Janikowski,* 823 F.2d at 948; *Held v. Gulf Oil Co.,* 684 F.2d 427, 430 (6th Cir.1982); *Caldwell v. Rowland,* 932 F.Supp. 1018, 1021 (E.D.Tenn.1996).

The continuing violation theory is a narrow, limited exception to the usual rule that statutes of limitations are triggered when the alleged discriminatory act occurred. *Haithcock,* 958 F.2d at 677–78; *Dixon,* 928 F.2d at 216; *E.E.O.C. v. Penton Industrial Pub. Co.,* 851 F.2d 835, 837–38 (6th Cir.1988); *Kresnak v. City of Muskegon Heights,* 956 F.Supp. 1327, 1331 (W.D.Mich.1997). There are two categories of continuing violations in employment discrimination cases. The first category arises where there is some evidence of present discriminatory activity giving rise to a claim of a continuing violation, *e.g.,* where an employer continues to impose disparate work assignments or disparate pay rates between similarly situated groups. *Haithcock,* 958 F.2d at 678; *Dixon,* 928 F.2d at 216; *Kresnak,* 956 F.Supp. at 1331; *Caldwell,* 932 F.Supp. at 1021. The rationale underlying this first category is that the employer commits an unlawful discriminatory act, such as giving unequal pay for equal work, each time the employer disburses the unequal pay. It is required, however, that at least one of the forbidden acts of discrimination must have occurred within the limitations period.

 The second category of continuing violations arises where there has occurred a longstanding, demonstrable policy of discrimination. There must be a continuing, over-arching policy of discrimination by the employer. Unrelated incidents of discrimination are insufficient to invoke this second category. *Haithcock,* 958 F.2d at 678; *Dixon,* 928 F.2d at 217; *Janikowski,* 823 F.2d at 948; *Kresnak,* 956 F.Supp. at 1331, 1333. Repeated requests by the plaintiff employee for relief from a prior act of discrimination ordinarily will not start the time limitation running anew. *Dixon,* 928 F.2d at 217; *Janikowski,* 823 F.2d at 949. Where there has been a longstanding policy of discrimination, repeated attempts to gain employment or promotions may each trigger the running of a new time limitations period. *Dixon,* 928 F.2d at 217; *Roberts v. North American Rockwell Corp.,* 650 F.2d 823, 827 (6th Cir.1981). However, an overarching policy of discrimination in and of itself is not sufficient to toll the running of the statute of limitations. There must still be a specific

alleged discriminatory event or act against the plaintiff that occurs within the relevant limitations period. *Dixon*, 928 F.2d at 217–18; *Conlin v. Blanchard*, 890 F.2d 811, 815 (6th Cir.1989); *Caldwell*, 932 F.Supp. at 1021.

■ The Court concludes that neither of these theories or categories of continuing violations are applicable to Damron's failure-to-hire or failure-to-promote claim. There was no incident of denial of a promotion or failure to hire Damron as a regular driver that occurred within the 180–day Title VII time limit and 300–day ADEA time limit immediately preceding the filing of his complaint with the EEOC. There must be a specific alleged discriminatory act committed against Damron by Yellow Freight within the limitations period measured back from the time he filed his complaint with the EEOC. *Gallagher*, 89 F.3d at 278; *Dixon*, 928 F.2d at 217–18; *Caldwell*, 932 F.Supp. at 1021. Damron has not presented any proof of such an incident. Moreover, Damron has not shown there was a longstanding policy of either Title VII or age discrimination on the part of Yellow Freight that was interconnected with the decision not to hire him as a regular driver in July or August, 1993. *See Kresnak*, 956 F.Supp. at 1333. As the Court explains in this memorandum opinion, Damron's ADEA claim of age discrimination and his Title VII claims of discrimination on the basis of national origin and race are without merit and these claims are being dismissed on summary judgment.

When it is alleged that an employer has engaged in Title VII discrimination or age discrimination regarding a refusal to hire or a failure to promote a person, the issue of whether there has been a continuing violation is complicated and sometimes difficult to resolve. In many situations, the refusal to hire or promote results from an ongoing employer policy of unlawful discrimination therefore making it appropriate to apply the continuing violation doctrine. *Roberts*, 650 F.2d at 826; *Kresnak*, 956 F.Supp. at 1332–33. In such instances, a continuing violation occurs each time an applicant is subjected to an adverse employment decision as a result of the employer's longstanding policy of discrimina-

tion. Damron's claim of a continuing violation does not fit within this legal theory.

■ Damron contends that Yellow Freight refused to hire or promote him to the position of regular driver in July or August 1993. He thereafter made a few inquiries about the matter to Yellow Freight and his union representatives. This Court rejects the concept that any single refusal to hire or failure to promote is a continuing violation which keeps the statute of limitations period open indefinitely until the desired hiring or promotion occurs. *See Kresnak*, 956 F.Supp. at 1333. The limitations period begins to run in response to a discriminatory act, not in mere response to the continuing effect of that discriminatory act. *Haithcock*, 958 F.2d at 678; *Dixon*, 928 F.2d at 216. In promotion cases, the statute of limitations starts to run when the person is denied a promotion and thereby received notice of the alleged discriminatory conduct. *Middleton v. City of Flint*, 92 F.3d 396, 401 n. 4 (6th Cir.1996); *Kresnak*, 956 F.Supp. at 1333. The Court finds there was only one alleged incident of refusal to hire or promote Damron that occurred in July or August 1993. Damron's subsequent inquiries seeking relief from this single incident of alleged discrimination and his requests for more information about it did not start the time limitation for filing a complaint with the EEOC running anew. *Dixon*, 928 F.2d at 217 (repeated requests for further relief from a prior act of discrimination will not set the time limitation running anew); *Janikowski*, 823 F.2d at 949; *Kresnak*, 956 F.Supp. at 1333. There was no other incident of failure to hire or promote that occurred within the 180–day Title VII time limitation or the 300–day ADEA time limitation prior to the date when Damron filed his complaint with the EEOC on June 15, 1995. Consequently, Damron's claim is time-barred and the continuing violation doctrine does not afford him any relief.

Furthermore, there is an alternative reason why this claim should be dismissed. Assuming *arguendo* that Damron's claim is not time-barred, the Court would dismiss the refusal-to-hire as a regular driver claim or failure-to-promote claim anyway. Damron

has not come forward with proof that Yellow Freight's decision not to hire him as a full-time, regular driver in July or August, 1993, was based on intentional discrimination that violates Title VII and ADEA.

### D. Title VII: Discrimination Based on National Origin

■ Damron next claims he is the victim of employment discrimination in violation of Title VII on the basis of his national origin as a natural born citizen of the United States. This claim arises out of Damron's disputes with Yellow Freight regarding his federal income taxes and his efforts to rescind or revoke his Social Security number. As explained *supra,* Damron contends that as a natural born citizen of the United States, he is not required to have a Social Security number. It is Damron's position that foreign aliens are being given preferential treatment in employment by Yellow Freight because the aliens have Social Security numbers while Damron does not.

The Court concludes this claim is frivolous and utterly devoid of any merit. It will be dismissed for the following reasons. First, Damron has not come forward with any proof whatsoever that Yellow Freight gave preferential treatment to a single foreign alien over Damron with regard to the assignment of work as a casual truck driver. Damron has not identified even one foreign alien who was working for Yellow Freight as a casual driver during the same period of time that Damron was employed by Yellow Freight. Thus, Damron's theory fails and is not supported by the facts and circumstances shown in this case.

■ Second, Damron cannot as a matter of law maintain a cause of action under Title VII on the premise that he has been subjected to employment discrimination by virtue of his status as a citizen of the United States. The Supreme Court has defined the term "national origin" as used in Title VII, 42 U.S.C. § 2000e–2(a)(1), to mean the country where a person was born, or from which his or her ancestors came. *Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 88, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973).[2] Title VII discrimination on the basis of national origin does not encompass claims grounded solely upon the citizenship of an individual. Discrimination on the basis of citizenship alone does not violate Title VII. National origin discrimination and citizenship discrimination are two separate, distinct phenomena. *Id.* at 91–92, 94 S.Ct. 334; *MacNamara v. Korean Air Lines,* 863 F.2d 1135, 1146–47 (3rd Cir.1988); *EEOC v. Switching Systems Div. of Rockwell Intern.,* 783 F.Supp. 369, 373 (N.D.Ill.1992). However, the Supreme Court has recognized there may be situations where discrimination on the basis of citizenship can also have the ultimate effect of discriminating on the basis of national origin. *Espinoza,* 414 U.S. at 92, 94 S.Ct. 334. To the extent that Damron makes a claim of discrimination under Title VII based solely on his status as a United States citizen, such a citizenship discrimination claim is not actionable as alleged national origin discrimination under Title VII.

Third, Damron's national origin discrimination claim is grounded on the erroneous belief and false concept that he is not required to have a Social Security number because he was fortuitously born in the United States. Damron admits he has been employed within the United States as a truck

---

2. 29 C.F.R. § 1606.1 provides:
The Commission defines national origin discrimination broadly as including, but not limited to, the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group. The Commission will examine with particular concern charges alleging that individuals within the jurisdiction of the Commission have been denied equal employment opportunity for reasons which are grounded in national origin considerations, such as (a) marriage to or association with persons of a nation origin group; (b) membership in, or association with an organization identified with or seeking to promote the interests of national origin groups; (c) attendance or participation in schools, churches, temples or mosques, generally used by persons of a national origin group; and (d) because an individual's name or spouse's name is associated with a national origin group. In examining these charges for unlawful national origin discrimination, the Commission will apply general Title VII principles, such as disparate treatment and adverse impact.

driver and earns substantial income from his employment. As the Court has already explained *supra*, Damron is required by federal law to have and use a Social Security number both for federal tax purposes with the IRS and for maintaining his employment records with the Commissioner of Social Security. Any contention by Damron to the contrary is the result on his peculiar brand of twisted logic which ignores and misinterprets applicable federal law.

Damron cannot bootstrap his way into a Title VII national origin discrimination claim by arguing that he has been subjected to employment discrimination for attempting to exercise his alleged "right" as a natural born United States citizen to unilaterally rescind or revoke his assigned Social Security number when no such right exists under federal law. Damron created the fallacious battle about revoking his Social Security number out of thin air as a means of furthering his tax protester activities and now he seeks to use this self-created dispute to portray himself as a victim of national origin discrimination. This he cannot do. The claim is ludicrous and preposterous. Social Security numbers are required of all individuals who are employed and earn income within the United States regardless of whether they are natural born United States citizens, naturalized United States citizens, or foreign aliens. 42 U.S.C. § 405(c). There is simply no national origin discrimination involved with regard to the issuance and use of Social Security numbers by the United States government. Moreover, Yellow Freight had an obligation to comply with federal law and use Damron's Social Security number when making official reports about Damron's income to the IRS and the Commissioner of Social Security. Yellow Freight should not and cannot be held liable for damages under Title VII because it chose to disregard or disagree with Damron's unfounded rantings about revoking his Social Security number.

Fourth, the two persons in Yellow Freight management who are accused by Damron of the national origin discrimination, Leonard Foster and Phillip Hinkle, are themselves native, natural born citizens of the United States. Damron does not bother to explain how or why Foster and Hinkle would want to intentionally discriminate against Damron based on his national origin when Foster and Hinkle have the same national origin as Damron. This further serves to underscore the absurdity of Damron's Title VII national origin discrimination claim.

Accordingly, the Title VII claim predicated on alleged national origin discrimination will be **DISMISSED**.

### E. Title VII: Discrimination Based on Race

Damron avers in his complaint that during his period of employment with Yellow Freight, he received lower paying "runs" or less lucrative casual truck driving job assignments than other casual drivers, especially African–American drivers who usually got preferred runs. This is the only arguable claim of race discrimination raised by Damron under Title VII. In response to Yellow Freight's summary judgment motion, Damron has not come forward with any proof whatsoever that supports his allegation of race discrimination. There is no proof offered by Damron which tends to establish that Yellow Freight discriminated against him on the basis of his race as a Caucasian by giving job preferences to African–American casual drivers. Damron cannot avoid summary judgment merely by relying on the allegations contained in his unverified complaint. In the absence of any proof to support his claim, the Court concludes that Damron's Title VII claim of race discrimination will be **DENIED**.

### F. Age Discrimination

 ADEA provides that employers may not discharge or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of the person's age. 29 U.S.C. § 623(a). Damron has the burden of proving by a preponderance of the evidence that age was a determining factor in the adverse action that his employer, Yellow Freight, took against him. *LaPointe v. United Autoworkers Local 600*, 103 F.3d 485, 487–88 (6th Cir.1996); *Wells v. New Cherokee Corp.*, 58 F.3d 233, 235 (6th Cir.1995);

Phelps v. Yale Security, Inc., 986 F.2d 1020, 1023 (6th Cir.1993). ADEA only prohibits employers from taking adverse employment actions against individuals which are actually motivated by intentional age discrimination. ADEA does not constrain employers from taking adverse action against their employees on the basis of other factors or reasons not related to age. There is no disparate treatment actionable under ADEA when the factors motivating the employer are some feature other than the employee's age. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993); *Lyon v. Ohio Educ. Ass'n & Professional Staff*, 53 F.3d 135, 138–39 (6th Cir.1995); *Allen v. Diebold, Inc.*, 33 F.3d 674, 676–77 (6th Cir. 1994).

The key question on motion for summary judgment in ADEA cases is whether there exists sufficient proof to create a genuine issue of fact as to whether the defendant employer intentionally discriminated against the plaintiff employee because of the employee's age. In the instant case, the Court concludes that Damron has not come forward with any proof that the reason Yellow Freight discharged him as a casual driver is age discrimination. The proof in the record establishes that the only reason Yellow Freight decided to discharge Damron is because Yellow Freight believed he was not sufficiently available on a regular basis to work as a casual truck driver. Even if we assume *arguendo* that one of the motivating factors in the decision to terminate Damron as a casual driver was the problems and disputes Damron had with Yellow Freight regarding his federal income taxes and Social Security number, this does not constitute age discrimination.

■ To preclude summary judgment on his ADEA claim, the burden is on Damron to establish a *prima facie* case of age discrimination either through direct evidence of intentional discrimination, or by showing the existence of circumstantial evidence which creates an inference of age discrimination. *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1248 (6th Cir.1995); *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1081 (6th Cir.1994); *Barnhart v. Pick-*

*rel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1390 (6th Cir.1993). Direct evidence is found, for instance, where an employer's policy is discriminatory on its face, or where a statement by the employer directly shows there is a discriminatory motive. *Schlett v. Avco Financial Services, Inc.*, 950 F.Supp. 823, 828 (N.D.Ohio 1996). Damron has not presented any direct proof that Yellow Freight had a subjective intent to discriminate against him on account of his age.

Absent direct evidence of age discrimination, courts apply a modified version of the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), to determine whether a plaintiff has established a *prima facie* case of discrimination by circumstantial evidence. *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996); *Woythal v. Tex-Tenn. Corp.*, 112 F.3d 243, 246 (6th 1997); *LaPointe*, 103 F.3d at 487 n. 2; *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 683, 136 L.Ed.2d 608 (1997); *Carpenter v. Western Credit Union*, 62 F.3d 143, 144 (6th Cir. 1995); *Manzer*, 29 F.3d at 1081; *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1329 (6th Cir.1994); *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 379 (6th Cir. 1993); *see also Burns v. City of Columbus, Dept. Of Public Safety*, 91 F.3d 836, 843 (6th Cir.1996). Age discrimination in employment claims involve shifting burdens of proof between the plaintiff employee and the defendant employer.

■ To establish a *prima facie* case of age discrimination under ADEA based on circumstantial evidence, Damron has the initial burden of proving all of the following elements by a preponderance of the evidence: (1) Damron was within the protected age group, *i.e.*, at least forty years of age at the time he was discharged from employment; (2) Damron was subjected to adverse employment action by being discharged or terminated by his employer, Yellow Freight; (3) he was qualified for the position of casual truck driver; and (4) he was replaced by

Yellow Freight with a substantially younger person. *O'Connor,* 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433; *Woythal,* 112 F.3d at 246; *Sovacool v. General Tire, Inc.,* 1997 WL 94690 (6th Cir. Mar.4, 1997); *Laughlin v. United Telephone–Southeast, Inc.,* 1997 WL 87218 (6th Cir. Feb.27, 1997); *Hartsel,* 87 F.3d at 800; *Cox v. Kentucky Dept. of Transp.,* 53 F.3d 146, 150 (6th Cir.1995). The Court finds that Damron has not presented any proof in support of the fourth element of the *prima facie* test. There is no proof that after Yellow Freight discharged Damron, it replaced him with a substantially younger casual truck driver.

 Moreover, Damron cannot establish the third element of his *prima facie* case. Yellow Freight does not dispute that Damron was a competent, experienced truck driver. Damron was not, however, qualified for the position of casual driver because he was not available for work when he was needed and when Damron said he could be available. The proof shows that availability is a very important, crucial qualification of the job of casual driver. To establish a *prima facie* case, Damron must show that he was performing his job at a level that met Yellow Freight's legitimate expectations. *Ang v. Procter & Gamble Co.,* 932 F.2d 540, 548 (6th Cir.1991); *McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1160 (6th Cir.1990). Yellow Freight had an objectively reasonable, legitimate expectation that Damron would be available to work as a casual driver when he said he was available. In this regard, Damron failed to meet his employer's legitimate expectations. Therefore, the Court concludes that Damron's age discrimination claim will be DISMISSED because he has failed to meet his burden of making out all of the required, essential elements of his *prima facie* case.

Assuming *arguendo* that Damron has made out a *prima facie* case of age discrimination, this would merely establish a rebuttable presumption or inference of age discrimination. *St Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Woythal,* 112 F.3d at 246; *E.E.O.C. v. Avery Dennison Corp.,* 104 F.3d 858, 861 (6th Cir.1997); *Burns,* 91 F.3d at 844; *Wixson v. Dowagiac Nursing Home,* 87 F.3d 164, 169 (6th Cir.1996). The burden of production of evidence then shifts to defendant-employer Yellow Freight to articulate some legitimate, nondiscriminatory reason for its actions. *Burdine,* 450 U.S. at 254, 101 S.Ct. 1089; *Woythal,* 112 F.3d at 246; *Cox,* 53 F.3d at 150. Yellow Freight's burden is one of production of evidence, not ultimate persuasion. *Wixson,* 87 F.3d at 169.

 If Yellow Freight is able to articulate a legitimate, nondiscriminatory reason for its actions, the inference of age discrimination raised by the *prima facie* case is rebutted and the factual inquiry proceeds to a new level of specificity. *U.S. Postal Service Bd. v. Aikens,* 460 U.S. 711, 714–15, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); *Avery Dennison Corp.,* 104 F.3d at 862. The burden of producing evidence then shifts again back to Damron to prove by a preponderance of the evidence that Yellow Freight's proffered reason for discharging him was a mere pretext for age discrimination. *Woythal,* 112 F.3d at 246–47; *Monette v. Electronic Data Systems Corp.,* 90 F.3d 1173, 1179 (6th Cir. 1996); *cf. E.E.O.C. v. Yenkin–Majestic Paint Corp.,* 112 F.3d 831, 834 (6th Cir.1997); *Ensley–Gaines v. Runyon,* 100 F.3d 1220, 1224 (6th Cir.1996). Pretext may be shown either directly by persuading the trier of fact that a discriminatory reason more likely than not motivated the employer, or indirectly by showing that the employer's proffered reason or explanation is unworthy of credence. *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089; *Yenkin–Majestic Paint,* 112 F.3d at 834; *Manzer,* 29 F.3d at 1082. To successfully challenge the credibility of Yellow Freight's explanation and reason for its decision to discharge Damron as a casual driver, Damron must be able to show by a preponderance of the evidence either that: (1) employer Yellow Freight's proffered reason has no basis in fact; (2) the proffered reason did not actually motivate the adverse employment action; or (3) Yellow Freight's proffered reason was insufficient to motivate the adverse employment action. *Tinker v. Sears, Roebuck & Co.,* 127 F.3d 519, 523 (6th Cir.1997); *Yenkin–Majestic Paint,* 112 F.3d at 834; *Burns,* 91 F.3d at 844; *Maddox v. Universi-*

*ty of Tennessee,* 62 F.3d 843, 848 (6th Cir. 1995); *Manzer,* 29 F.3d at 1084; *Barnhart,* 12 F.3d at 1390.

Despite these shifting burdens of producing evidence, plaintiff Damron at all times bears the ultimate burden of persuasion that Yellow Freight's action was the product of deliberate, intentional age discrimination. *St. Mary's Honor Center,* 509 U.S. at 514, 113 S.Ct. 2742; *Avery Dennison Corp.,* 104 F.3d at 862; *Wixson,* 87 F.3d at 170. In some cases a plaintiff employee can meet his ultimate burden of persuasion where the factfinder's disbelief of the defendant employer's proffered explanation is coupled with proof of a *prima facie* claim. If a plaintiff employee establishes a *prima facie* case and also shows that the employer's proffered explanation is false, then this may suffice to allow the factfinder to infer intentional age discrimination but such an inference is not required in all cases. *St. Mary's Honor Center,* 509 U.S. at 511, 113 S.Ct. 2742; *Yenkin–Majestic Paint,* 112 F.3d at 835; *Ensley–Gaines,* 100 F.3d at 1227; *Wixson,* 87 F.3d at 170; *Manzer,* 29 F.3d at 1083. As the Supreme Court explained in *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089, the plaintiff employee's burden to prove pretext merges with the employee's ultimate burden of persuasion that he has been the victim of intentional age discrimination. *See Avery Dennison Corp.,* 104 F.3d at 862; *Betkerur v. Aultman Hosp. Ass'n,* 78 F.3d 1079, 1095–97 (6th Cir.1996) (plaintiff employee cannot always survive summary judgment motion simply by casting doubt upon employer's proffered reason. Employee must come forward with sufficient proof from which it is possible to infer the ultimate fact of intentional discrimination.); *Barnhart,* 12 F.3d at 1390. Proving the employer's proffered reason is false becomes part of and considerably assists in the greater enterprise of proving that the true reason underlying the employer's actions was intentional discrimination. *St. Mary's Honor Center,* 509 U.S. at 516, 113 S.Ct. 2742.

The Court finds that Yellow Freight has articulated a legitimate, nondiscriminatory reason for terminating Damron's employment as a casual driver. Damron was not consistently available when called by Yellow Freight to work as a casual driver. He has not come forward with substantive proof that Yellow Freight's proffered explanation is merely a false pretext for intentional age discrimination. There is no proof from Damron showing that the reason given by Yellow Freight is false, or without a factual basis, or insufficient to motivate the decision to terminate Damron. In short, the Court finds that Damron has not submitted sufficient proof from which intentional age discrimination can reasonably be inferred by an objective, rational trier of fact. Accordingly, Yellow Freight is entitled to have summary judgment entered in its favor dismissing the age discrimination claim.

In reaching this conclusion, the Court has also taken the following facts into consideration. Damron's allegation of age discrimination is refuted by Yellow Freight's hiring patterns after Damron was terminated as a casual driver. For the remainder of 1995, Yellow Freight hired 72 casual drivers and 31 of them, or 43%, were over forty years of age and in the protected age class. Five casual drivers hired in 1995 were older than Damron. These hiring decisions were made by Foster, the same person who made the decision to hire and terminate Damron. These statistics submitted by Yellow Freight rebut the allegation that Yellow Freight was motivated by intentional age discrimination when it terminated Damron's employment. *See Grossmann v. Dillard Department Stores, Inc.,* 109 F.3d 457, 459 (8th Cir.1997) (hiring workers in the protected age group after discharging the plaintiff dispels inference on intentional age discrimination).

Moreover, any inference of age discrimination is further dispelled by the undisputed fact that Damron was 49 years of age when initially hired by Yellow Freight in October 1992, which was well within the protected age class under ADEA. Damron was terminated only a relatively short time later on February 23, 1995. The person who made both decisions to hire and terminate Damron was Foster. There is a strong inference that discharge decisions are not motivated by age discrimination under these circumstances. Since Foster was willing to hire

Damron when he was already 49 years old, it is most unlikely that Foster later made the decision to terminate Damron on the basis of intentional age discrimination. Logic dictates that if Foster was motivated by age discrimination, he never would have hired Damron in the first place. *Herr v. Airborne Freight Corp.,* 130 F.3d 359, 362–63 (8th Cir.1997); *Chiaramonte v. Fashion Bed Group, Inc.,* 129 F.3d 391, 399 (7th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1795, 140 L.Ed.2d 936 (1998); *Rothmeier v. Investment Advisers, Inc.* 85 F.3d 1328, 1337 (8th Cir.1996); *Hartsel v. Keys,* 87 F.3d 795, 804 n. 9 (6th Cir.1996); *Buhrmaster v. Overnite Transportation Co.,* 61 F.3d 461, 464 (6th Cir.1995), *cert. denied,* 516 U.S. 1078, 116 S.Ct. 785, 133 L.Ed.2d 736 (1996); *Lowe v. J.B. Hunt Transport, Inc.,* 963 F.2d 173, 174–75 (8th Cir.1992); *Proud v. Stone,* 945 F.2d 796, 797–98 (4th Cir.1991); *Johnson v. McDonald & Company Securities, Inc.,* 982 F.Supp. 483, 488 (N.D.Ohio 1997). It is incredible to believe that Foster, the man who hired Damron when Damron was already 49 years old, suddenly developed an aversion to older workers and approximately two years later terminated Damron at 51 years of age due to intentional age discrimination.

 In his complaint, Damron avers that Yellow Freight is known for having a policy of preferring to hire younger employees. He does not provide any probative proof to support this conclusory allegation. Damron asserts that this alleged discriminatory policy is evidenced by Yellow Freight requiring its applicants for the position of truck driver to pass a pre-employment physical fitness test. (Court File No. 39, Damron's Affidavit, pp. 5–6; and Court File No. 38, Attachment, Affidavit of John Alexander). The Court finds that the mere fact Yellow Freight may have instituted a pre-employment physical fitness test for its truck drivers is not *per se* proof of age discrimination. It is common knowledge that the job duties of a truck driver require a substantial degree of physical strength and endurance. It is reasonable for Yellow Freight to require that job applicants successfully pass a physical examination before employing them. In any event, Damron does not explain how this specifically affected him. According to Damron, the pre-

employment physical fitness test program was not implemented by Yellow Freight until after Damron had already been terminated. Damron does not contend that he was ever subjected to a physical fitness test and rejected for employment on this basis by Yellow Freight. Damron has the burden of showing that he was subjected to intentional age discrimination. The allegation of a general corporate policy of age discrimination against older drivers is mere speculation and is directly refuted by the fact that Yellow Freight employed Damron as a casual driver when he was already 49 years old. If Yellow Freight supposedly had a policy of preferring younger drivers, then Yellow Freight would not have employed Damron in the first place. Moreover, Yellow Freight hired numerous persons as truck drivers who were in the protected age group over forty years of age.

### G. Retaliation

 The Title VII and ADEA retaliation claims are also without merit. Title VII and ADEA prohibit retaliation by employers. 42 U.S.C. § 2000e–3(a) makes it unlawful for any employer to discriminate and retaliate against an employee because the employee has opposed any Title VII unlawful employment practice, or because the employee made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under Title VII. 29 U.S.C. § 623(d) of ADEA provides it shall be unlawful for an employer to discriminate, *i.e.,* retaliate, against any of its employees because the employees have opposed any age discrimination practice prohibited by § 623, or because the employees have made a charge, testified, assisted or participated in any manner in an investigation, proceeding or litigation under ADEA. To establish a *prima facie* claim of retaliation, Damron is required to show the following four elements: (1) he engaged in an activity protected by Title VII and ADEA; (2) this exercise of his protected civil rights by Damron was known to his employer, Yellow Freight; (3) Yellow Freight *thereafter* took an employment action adverse to Damron; and (4) there was a causal connection between the protected activity and the adverse employment action. *Williams v.*

*Nashville Network,* 132 F.3d 1123, 1131 (6th Cir.1997); *Avery Dennison Corp.,* 104 F.3d at 860; *Wrenn v. Gould,* 808 F.2d 493, 500 (6th Cir.1987).

■ The Court concludes that Damron has utterly failed to make out even a *prima facie* case of retaliation. Damron complains he was subjected to retaliation by being discharged from employment as a casual driver after he informed Yellow Freight that he was contemplating filing an employment discrimination complaint with the EEOC. The record shows, however, that Yellow Freight stopped calling Damron to work as a casual driver in about December 1994. Damron's supervisor at Yellow Freight, Foster, made the official, final decision to remove Damron from the casual drivers' call list on February 23, 1995. It was not until several months after this adverse employment action had already been taken by Yellow Freight that Damron threatened to file a complaint with the EEOC. Damron's formal, written complaint was filed with the EEOC on June 15, 1995. Damron cannot show that the earlier decision made on February 23, 1995, by Yellow Freight to remove Damron from its list of casual drivers was done in retaliation for any protected activity on the part of Damron. There is no causal connection between the adverse employment action by Yellow Freight and Damron's activity protected under Title VII and ADEA, *i.e.,* right to complain to the EEOC. The adverse employment action preceded the protected activity. *Wrenn,* 808 F.2d at 503. The retaliation claims will be **DISMISSED.**

## IV. *Rule 11 Motion For Sanctions*

Yellow Freight has moved to impose sanctions on Damron pursuant to Rule 11 of the FEDERAL RULES OF CIVIL PROCEDURE. In reviewing the record, it is not clear to the Court whether Yellow Freight has complied with the mandatory "safe harbor" procedural prerequisite as provided in Rule 11(c)(1)(A). *Ridder v. City of Springfield,* 109 F.3d 288, 294–95 (6th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 687, 139 L.Ed.2d 634 (1998). Before the Court will proceed to adjudicate the Rule 11 motion for sanctions, it will first allow Yellow Freight an opportunity to demonstrate that it has complied with Rule 11(c)(1)(A). In the meantime, the Court will **RESERVE** a decision on the Rule 11 motion.

An order will enter.

### ORDER

In accordance with the accompanying memorandum opinion, it is hereby **ORDERED** that:

(1) The motion by defendant Yellow Freight System, Inc. for summary judgment (Court File No. 23) is **GRANTED** pursuant to FED. R. CIV. P. 56. The plaintiff's complaint is **DISMISSED WITH PREJUDICE;**

(2) The plaintiff's motion to extend pretrial discovery (Court File No. 53) is **DENIED;**

(3) The Court **RESERVES** ruling on the defendant's motion to impose sanctions on the plaintiff pursuant to FED. R. CIV. P. 11. (Court File No. 25). On or before **July 23, 1998,** defendant Yellow Freight System, Inc. shall file with the Court a response showing whether it has complied with the "safe harbor" provision in Rule 11(c)(1)(A); and

(4) The plaintiff Leroy Damron shall pay the defendant's costs of this action pursuant to 28 U.S.C. § 1920 and FED. R. CIV. P. 54(d)(1). Defendant shall file its bill of costs with the Clerk of Court pursuant to 28 U.S.C. § 1924 and E.D.TN. LR 54.1. The Clerk shall assess and tax the costs against Leroy Damron.